UNITED STATES, Appellee

v.

WENDELL O. HUBBARD, Private E–2, U. S. Army, Appellant

5 USCMA 525, 18 CMR 149

No. 5225

Decided March 11, 1955

Lt Col George M. Thorpe, U. S. Army, Maj Edwin Doran, U. S. Army, and Capt Albert C. Malone, Jr., U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, Lt Col Thomas J. Newton, U. S. Army, 1st Lt Richard F. Ralph, U. S. Army, and 1st Lt Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

Intermediate appellate authorities have affirmed accused's conviction for wrongful use of narcotics, in violation of Article 134, Uniform Code of Military Justice 50 USC § 728. We granted review to consider the following issues:

"1. Whether the trial counsel, by insinuations and improper questions, deprived the accused of a fair trial.

"2. Whether the law officer was required to instruct on the defense of ignorance of fact."

On the morning of December 16, 1953, the accused smoked a cigarette which concededly contained morphine. Later that day, he was arrested and a specimen of his urine obtained. Analysis of the specimen showed the presence of a morphine alkaloid. At the trial, the accused denied knowledge of the fact that some of the tobacco from the cigarette had been replaced by morphine powder.

Private Cleveland Hodge was the chief witness for the prosecution. He testified that he was the orderly of the hut in which the cigarette was smoked. He saw the accused and Private Glass in the hut at about 9:00 a.m. No one else was present. Glass asked to borrow his pass, but he refused to lend it. He went to the laundry room. On his return a few minutes later, he found the accused and Glass still in the hut. Hodge went to his bunk and pretended to sleep. Actually however, he watched the others. He observed Glass take some paper from his pocket. When the paper was unfolded, he saw a quantity of white powder. Glass then rolled a cigarette in his palm. On working out some of the tobacco, he inserted the powder. The accused watched the operation while seated on

526

a foot locker about 16 inches away from Glass. When it was completed, Glass lit the cigarette. He took a "draw" and passed it to the accused, who did the same thing. The cigarette was thus exchanged three or four times. Hodge then left the hut. He went to the orderly room to report what he had seen.

On cross-examination, Hodge acknowledged his signature on a sworn statement, given to the investigating officer about three weeks before the trial. In the statement he said, "The first time that I saw Hubbard was when I returned from laundry." He maintained that at the time he gave the statement, Article 31, 50 USC § 602, was not read to him. However, the investigating officer, testifying later for the defense, said that he read Article 31 to Hodge, and also explained the meaning of some of its terms to him. Hodge admitted that he had been twice convicted for sleeping on post.

The accused testified on his own behalf. In his direct examination he explained that he went to the hut in search of a friend who was going on rest and recuperation with him that day. On entering, he saw Hodge and Glass. Although not particularly friendly with Glass, he knew him for about three months. Seeing Glass with a cigarette, he asked him for one. Glass replied that he had no others, but he was willing to let the accused have a "few drags" on the one he was smoking. The offer was accepted. After four or five puffs, the accused returned the cigarette to Glass.

In the smoking, the accused noticed nothing unusual about the cigarette, and he experienced no odd effects. Later in the day, he obtained a package of cigarettes from a friend and smoked some. Thereafter, he was taken into custody by Criminal Investigation Division agents, and at their request he provided a sample of his urine. On cross-examination, when asked to account for the presence of morphine in his system, he said, "I found out yesterday the only way I could get it . . . was from that [the Glass] cigarette." After other questions on the point, the cross-examination continued as follows:

"Q. Private Hubbard, do you know if you have ever been suspected of using narcotics by Captain Peterson?

"DEFENSE COUNSEL: I object to the question. I don't think the witness has any way of knowing and certainly—

"LAW OFFICER: (Interrupting) Sustained.

"Q. Private Hubbard, have you ever been apprehended before by the CID?

"DEFENSE COUNSEL: I object to that as being beyond the scope of cross examination.

"TRIAL COUNSEL: Sir, I believe when the accused takes the stand, the rules of cross-examination are somewhat liberalized

"LAW OFFICER: I will overrule the objection.

"Q. Would you answer the question, please? Have you ever been apprehended before by the CID?

"A. I have been stopped once by the CID.

"Q. Did they say why they stopped you?

"A. Yes sir; they told me what they were looking for.

"Q. What were they looking for?

"A. They were looking for—

"DEFENSE COUNSEL: I object to that question because whatever he said would be based on what someone else told him, and it would be hearsay.

"LAW OFFICER: Overruled.

"Q. Would you answer the question?

"A. (No answer.)

"TRIAL COUNSEL: Will the reporter please read back the last question?

"REPORTER: Did they say why they stopped you?

"A. No, they didn't."

At the conclusion of accused's testimony a recess was taken. When court reconvened, the accused was recalled to the stand. He was then questioned by his own counsel:

"Q. Hubbard, is there anything else you would like to tell the court?

"A. Yes sir.

"Q. What is that?

"A. I want to correct a mistake I made.

**527**

"Q. What was that?

"A. About when the CID stopped me that they was looking for narcotics.

"Q. That is, they did tell you what they were looking for?

"A. Yes sir.

"Q. Did they find any narcotics?

"A. No sir.

"Q. Is everything else you told the court the truth?

"A. Yes sir."

Private Glass corroborated the accused. Testifying for the defense, he said that after Hodge refused his request for the loan of his pass, he went to his own bunk, and "fixed" a cigarette by rolling out some of the tobacco and substituting morphine powder. Hodge was the only other person in the hut at that time, and he soon left. He did not know when Hodge returned, but he had smoked about half the cigarette before the accused entered, and asked him for one. Having no others, he offered the accused "some drags" from the one he was smoking. He did so because he "didn't want him [the accused] to become suspicious that I was using narcotics." He believed there was no risk because "several draws" would not have any effect if the accused "hadn't used narcotics before." He admitted that he was tried for his "part" and had entered a plea of guilty. He had no previous convictions and had never been in any other trouble. On his cross-examination by trial counsel, the following occurred:

"Q. Did I understand you correctly to state you had been suspected of using narcotics?

"A. No sir.

"DEFENSE COUNSEL: I don't believe he made that statement.

"TRIAL COUNSEL: I am sorry. I will withdraw the question and request that the question and answer be stricken.

"LAW OFFICER: Very well, it will be stricken and disregarded by the court."

For rebuttal, the prosecution recalled the Criminal Investigation Division agent who had arrested the accused. He stated that he "worked on" a sub-

stantial number of narcotic cases. In his opinion, a person who uses narcotics for the first time "gets very sick—nauseated" "most of the time." He also testified that when he searched the accused, he found among his possessions a full pack of cigarettes and a second pack containing three or four.

An accused who takes the stand to testify on the merits is subject to cross-examination and impeachment in the same manner and to the same extent as an ordinary witness. United States v. Russell, 3 USCMA 696, 14 CMR 114. Like any witness, he takes his credibility with him to the stand, and he may be questioned on matters which reasonably tend to impair his veracity. Manual for Courts-Martial, United States, 1951, paragraph 138*f* (2), page 244, paragraph 149*b* (1), page 280. One method of attack is to show that the witness, including an accused, has "committed a crime affecting his credibility." Manual, supra, paragraph 153 *b*, pages 290–291. In some of the Federal courts, the commission of the offense must be followed by conviction before it can be used for impeachment. Little v. United States, 93 F2d 401 (CA8th Cir 1937). Seemingly, in others, the act of misconduct may be used on cross-examination to discredit the witness, regardless of whether the offense resulted in conviction. Coulston v. United States, 51 F2d 178 (CA 10th Cir 1931). But cf. Michelson v. United States, 335 US 469, 482, 93 L ed 168, 177, 69 S Ct 213. See also United States v. Dutey [ACM S–7392] 13 CMR 884. The Government strongly argues that the rule intended for the military is in accord with the latter view. This contention is founded upon the following Manual provision:

"It is generally not permissible to impeach a witness upon the ground that he has committed a crime affecting his credibility by adducing—by means other than cross-examination of the witness—evidence not amounting to proof of conviction of the crime." (Manual, supra, paragraph 153*b*, page 291.)

See also: Legal and Legislative Basis,

Manual for Courts-Martial, United States, 1951, page 242.

In United States v. Long, 2 USCMA 60, 6 CMR 60, this Court upheld a ruling by the law officer which excluded certain defense questions relating to alleged acts of misconduct by a prosecution witness. Acknowledging the limited rule followed by one group of Federal cases, we assumed for the purposes of that case that it would be proper to impeach the credibility of the witness by cross-examination as to acts of misconduct, even though they had not resulted in conviction. Here, as in the Long case, we may make the same assumption. Even then, however, there is no justification for the questions asked in the cross-examination of the accused.

No act of misconduct affecting the accused's credibility was presented. On the contrary, the cross-examination consists only of "repeated innuendoes and insinuations" resulting from a "fishing expedition." United States v. Long, supra, page 71. The accused was asked if his commanding officer "suspected" him of using narcotics. Objection to this question was sustained, but it was immediately followed by a series of questions touching upon the circumstances of his arrest by Criminal Investigation Division agents. Questions of that nature are condemned by those Federal courts which allow cross-examination on acts of misconduct not resulting in conviction as much as by those following the more restricted rule. Thus, after summarizing the general rules the Circuit Court of Appeals for the Tenth Circuit in Coulston v. United States, supra, page 182, said:

". . . A witness may not be asked if he has been accused or arrested for a crime, for the sufficient reason that it calls for hearsay evidence, and because accusation carries no implication of guilt."

The Government seeks to support the cross-examination on the ground that the accused's direct testimony opened the door to refutation. It purports to find a basis for probing into his prior arrest in the statement that he had never used narcotics. The board of review rejected this contention.

In Walder v. United States, 347 US 62, 98 L ed 503, 74 S Ct 354 the United States Supreme Court upheld the admission of certain evidence for impeachment of the accused's direct testimony notwithstanding it had previously been suppressed because it was in violation of the accused's constitutional rights. That case, however, provides no support to the Government. There, the accused testified on direct examination that he had never possessed, sold, nor had he ever given, narcotics to anyone at any time; neither had he ever acted as a conduit for transmission to another. The Supreme Court held that it was proper to refute this testimony with evidence that, on a prior occasion, heroin had been found in his possession. Mr. Justice Frankfurter, writing for the Court, noted (page 65):

"Take the present situation. Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics. Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility."

We may assume the accused's testimony here is as broad as that in the Walder case. However, the "misconduct" in the two cases is so different as to require a different conclusion. In Walder, the impeachment consisted of a showing of actual prior possession of a contraband narcotic. All that appears in this case is suspicion. Suspicion of wrongdoing cannot be substituted for the fact of wrongdoing as a basis for impeachment. United States

v. Long, supra. Hence, trial counsel's cross-examination was entirely improper and should not have been permitted over the accused's objection.

Error being present, we must appraise its effect upon the court. In United States v. Russell, ■ supra, we held that improper cross-examination of an accused as to other acts of misconduct is not to be regarded as prejudicial where the record shows "an abundance of competent evidence of guilt." The board of review below determined that the defense testimony was "inherently unworthy of belief," but that of the prosecution witness Hodge was "compelling." Consequently, it concluded that the error was not prejudicial. We reach a different conclusion.

The crux of the case is whether the accused knew of the presence of morphine in the cigarette he shared with Glass. At the trial, Hodge was the only prosecution witness testifying to such knowledge. He stated that the accused and Glass were together in the hut before he went to the laundry, and they were still present on his return. Yet, in his sworn statement to the investigating officer, he said, "The first time that I saw Hubbard was when I returned from laundry." The discrepancy is particularly significant when contrasted with the testimony of Glass. According to Glass, he was alone when he first saw Hodge in the hut. The accused did not come in until after he had "fixed" the cigarette and smoked part. Hodge was further discredited, when his testimony that Article 31 had not been read to him by the investigating officer was contradicted by that official. Finally, he was impeached by the admission that he was twice convicted for sleeping on post. Hodge's credibility, therefore, was clearly a matter requiring careful scrutiny.

The court, and the board of review as well, could believe Hodge in preference to the accused and Glass. The issue, however, is not to resolve a conflict in credibility. Rather, it is to determine what effect the improper cross-examination had on the court-martial. See United States v. Yerger, 1 USCMA 288, 3 CMR 22. It needs little imagination to conclude that a showing that the accused was suspected of possessing narcotics, and had, in fact, been previously apprehended and searched by Criminal Investigation Division agents for that purpose, would incline the Court to believe that he knowingly used the drug in this instance. The probability of the risk is heightened by the failure of the law officer to instruct the court on the limited purpose for which it could consider the evidence. It was aptly noted by the Court of Appeals for the Eighth Circuit in Miller v. Territory of Oklahoma, 149 Fed 330, 339, that:

". . . The zeal, unrestrained by legal barriers, of some prosecuting attorneys, tempts them to an insistence upon the admission of incompetent evidence, or getting before the jury some extraneous fact supposed to be helpful in securing a verdict of guilty, where they have prestige enough to induce the trial court to give them latitude. When the error is exposed on appeal, it is met by the stereotyped argument that it is not apparent it in any wise influenced the minds of the jury. The reply the law makes to such suggestion is: that, after injecting it into the case to influence the jury, the prosecutor ought not to be heard to say, after he has secured a conviction, it was harmless. As the appellate court has not insight into the deliberations of the jury room, the presumption is to be indulged, in favor of the liberty of the citizen, that whatever the prosecutor, against the protest of the defendant, has laid before the jury, helped to ' make up the weight of the prosecution which resulted in the verdict of guilty."

Since the error in the cross-examination of the accused is prejudicial, we need not consider the second argument for reversal of the conviction. The decision of the board of review is reversed. The findings of guilty and the sentence are set aside, and a rehearing is ordered.

Judges LATIMER and BROSMAN concur.