## UNITED STATES, Appellee

v.

## PAUL J. BERTHIAUME, Private First Class, U. S. Army, Appellant

## 5 USCMA 669, 18 CMR 293

672

No. 5129

Decided April 22, 1955

LT COL George M. Thorpe, U. S. Army, and 1ST LT Jackson L. Kiser, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, LT COL Thomas J. Newton, U. S. Army, and 1ST LT Elliott H. Eisman, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This case—here on petition—presents several problems in the area of cross-examination. A general court-martial sitting in Japan found the accused guilty of robbery and of aggravated assault—in violation of the Uniform Code of Military Justice, Articles 122 and 128, 50 USC §§ 716 and 722, respectively. He was sentenced to receive a dishonorable discharge, as well as to total forfeitures and confinement at hard labor for two years. The findings and sentence were approved by the convening authority and affirmed by a board of review in the office of The Judge Advocate General, United States Army. The accused now urges on appeal that at the trial the law officer erred in two rulings having to do with the permissible extent of cross-examination of prosecution witnesses.

### II

Mitsuo Takahashi testified that shortly before midnight on June 29, 1953, he observed three soldiers beating a Korean in Tendo, Japan. One of the assailants grappled with Takahashi and directed that he produce his wallet.

Thereafter he was kicked in the mouth and struck on the back of the head, whereupon he became insensible. On regaining consciousness, he discovered that his purse and a watch were missing. The former item was not recovered, but the watch was returned to him three days later. After identification by the witness, this watch was received in evidence as Prosecution Exhibit 1. To the best of the witness' recollection, three people were engaged in assaulting him—but he made no attempt at the trial to identify his attackers.

Kiichiro Goto testified that in the early morning hours of June 30, 1953, he was bicycling on a Japanese highway, when a man appeared suddenly and struck him with a large wooden club. Goto became unconscious, but he did recall that he had been struck by more than one individual, and that the person he first saw was an American soldier. A Sergeant First Class named Wilson, who had been on duty during the night of June 29, indicated that after receiving an assault report, he had set up a road block and had apprehended the accused, Berthiaume, and two other soldiers, Beaulieu and Bas-

674

inger—this despite unsuccessful efforts by the accused and Basinger to avoid the block. Next, one Sergeant First Class Wnuwkoski, an Army investigator, identified Prosecution Exhibit 1 as a watch he had taken from Beaulieu's wall locker.

Beaulieu himself told the court-martial that on the evening of June 29, 1953, he had been in the company of Berthiaume and one Nottingham when they encountered a Japanese National with whom Berthiaume withdrew and engaged in private conversation. After "a little rumpus . . . Berthiaume came back up there and said he had a little trouble with the Japanese fellow." At that time—according to Beaulieu — Berthiaume handed the former the watch which was subsequently found in his locker by Sergeant Wnuwkoski. Beaulieu added that later that night, when a Japanese boy passed on a bicycle, the accused had knocked the cyclist down with a fence post. Beaulieu denied that he had himself struck either Japanese. In connection with an impeachment effort by the defense, the following colloquy took place, which produced one of the defense's assignments of error:

"Q. Haven't you recently confessed to stealing a radio?

"TC (interposing): Objection.

"LO: The objection is sustained.

"TC: I would like the court to be instructed to disregard that question.

"LO: The court will disregard the last question. If counsel has any proof that this witness has been convicted of an offense he will bring it forth and will cease making remarks such as the last one if he has no proof.

"DC: We submit that paragraph 153b(2)(b) of the Manual for Courts-Martial states that a witness—

"LO (interposing): Counsel will not state the law. If you want to refer the court to a particular paragraph you will do so. Furthermore, I am not about to take any argument from counsel. What do you want to bring to the court's attention?

"DC: 'Conviction of Crime.' Paragraph 153b(2)(b), sir.

"LO: Conviction of a crime. That is exactly what I instructed counsel. If he says no, then you must and shall and will bring forth proof that he has. Proceed.

"DC: Am I to understand that I am not allowed to show that this witness may have a bad character?

"LO: No, you may do it. Certainly you may do it, but you will do it in the proper manner, way and procedure. If you have such evidence, then bring it forth in the proper manner and proper way. Allegations to a man's character are not proper cross-examination. The question in itself is an allegation. Reporter, read the last question by counsel back, that was objected to by the trial counsel.

"REPORTER: Haven't you recently confessed to stealing a radio?

"LO: That is an allegation, counsel. There is not any sign that it is a conviction.

"DC: We submit that—

"LO (interposing): Counsel, we will not take any argument on the point.

"DC (continuing to witness):

"Q. You state that all of you were afraid, is that correct?

"A. At the last.

"LO (interposing): At this time I will ask counsel, are you dropping the subject of this alleged theft of a radio?

"DC: Upon instructions of the law officer, I am, sir.

"LO: The law officer's instructions were as to the manner of procedure, that it was improper, and that you did not have to cease. Your procedure was wrong, and I want that in the record. The court will disregard the last question that was objected to."

The defense made no further effort to inquire into a previous confession by Beaulieu to larceny.

The testimony of Private First Class Nottingham substantially conformed to that of Beaulieu—being equally inculpatory of the accused and exculpatory of the witness. In cross-examination, the following incident is reported in the record:

"Q. Isn't it a fact that in civilian life you were convicted of a crime involving moral turpitude?

"TC (interposing): Objection, unless the defense is prepared to prove he was convicted of a crime involving moral turpitude.

"LO: We will sustain the objection unless defense counsel is prepared to prove it in the event the witness says no.

"DC: No further questions.

"LO: If you are prepared to offer proof we will allow the question.

"DC: The proof which I have is not admissible in court. Therefore, I cannot ask the question, and have no further questions.

"TC: I would like the court instructed to disregard the last question.

"COURT MEMBER: May I ask a question of the law officer? Is it necessary to offer proof if the question is asked and the witness answers in the affirmative?

"LO: The principle of law is that you cannot ask the question unless you are prepared to prove it at that time, regardless of the answer of the witness.

"TC: I have asked it before. I would like the law officer to instruct the court to disregard any inference that may be drawn from the last question of defense counsel.

"LO: The court is so instructed."

After Nottingham had concluded his testimony, defense counsel requested an out-of-court hearing, during which he sought to reopen the matter of Nottingham's impeachment by means of an inquiry concerning conviction in civilian life of an offense involving moral turpitude. Defense counsel conceded that he was not certain that the witness had been so convicted, but insisted that he wished to determine whether this had been the case. The law officer indicated that, if the defense considered it of sufficient materiality, he would grant a continuance of three weeks to enable defense counsel to learn whether Nottingham had been previously convicted. However, the defense did not take advantage of the law officer's offer.

The final prosecution witness, Corporal Basinger, testified concerning the attack on the bicyclist only, and apparently had not been present at the time of the robbery. Basinger candidly stated that he, Beaulieu, Nottingham, and the accused had each struck Goto, but added that he had promptly withdrawn from the enterprise and had sought to discourage Berthiaume, who had initiated the assault.

After the prosecution rested, the defense recalled Sergeant Wilson, who stated that Beaulieu's reputation for honesty was poor. Corporal Basinger—also recalled to testify—stated that Berthiaume possessed a good reputation within his organization. The accused himself elected to remain silent.

III

The proper extent of cross-examination in a Federal court was recently considered by the Court of Appeals for the Second Circuit in United States v. Provoo, 215 F2d 531. That Court commented that "as generally held, specific acts of misconduct not resulting in conviction of a felony or crime of moral turpitude are not the proper subject of cross-examination for impeachment purposes." On the contrary, some Federal cases do not appear to require the presence of a conviction as a basis for impeachment of an ordinary witness by reason of previous misdeeds. See United States v. Hubbard, 5 USCMA 525, 18 CMR 149; United States v. Klass, 166 F2d 373 (CA 3d Cir); Simon v. United States, 123 F2d 80 (CA 4th Cir); Beaty v. United States, 203 F2d 652 (CA 4th Cir); United States v. Dutey [ACM S-7392], 13 CMR 884.

It seems, however, that we are not required to concern ourselves with this question, since the military rule is clearly defined—and provides for a substantially broader scope of cross-examination than that authorized in the Second Circuit. Paragraph 149b(1) of the Manual for Courts-Martial, United States, 1951, states specifically that:

". . . On the question of his credibility and *within the limits im-*

676

*posed by the privilege against self-incrimination* a witness may be cross-examined as to any matter touching upon his worthiness of belief, including (unless the court in its discretion decides that the relationship of the particular matter to the credibility of the witness is too remote) his relation to the parties and to the subject matter of the case, his interest, motives, and inclinations, his way of life, affiliations, associations, *acts of misconduct*, habits, and prejudices, his means of obtaining a correct and certain knowledge of the facts about which he testifies and the manner in which he has used those means, his powers of discernment, memory and description, and his physical defects, infirmities, and mental idiosyncrasies." [Emphasis supplied.]

If the framers of the Manual meant to demand that acts of misconduct, to be usable for this purpose, must have resulted in convictions, it is difficult to understand why they did not make the requirement explicit. This seems especially true for the reason that no mention of "acts of misconduct" is to be found in the 1949 Manual, although that source makes clear that a witness may properly be cross-examined as to previous convictions of offenses involving moral turpitude or otherwise affecting credibility. See paragraph 139*b*. In connection with the present Manual's phrasing, it was commented by the draftsmen that paragraph 149*b* (1) "has been somewhat amplified with respect to matters which may be gone into in testing the credibility of a witness." Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 236.

Moreover, it would be anomalous to include the limitation of the privilege against self-incrimination if a prior conviction were necessary for the utilization of a witness' acts of misconduct for an impeachment purpose. Once convicted, a witness could scarcely incriminate himself of the offense in question. The only possibility pointing in a contrary direction would relate to the period during which the initial findings by a court-martial were being reviewed by appellate agencies. During this stage, however, it appears that the findings may not properly be used for impeachment in any event. Campbell v. United States, 176 F2d 45 (CA DC Cir); United States v. Belcher [ACM S-7051], 12 CMR 919. Therefore, the reference to the privilege against self-incrimination in connection with impeachment of credibility must have been made with another object in mind.

In paragraph 153*b* (2) (*b*) of the 1951 Manual, the following caution is given:

"It is generally not permissible to impeach a witness upon the ground that he has committed a crime affecting his credibility by adducing— *by means other than cross-examination of the witness*—evidence not amounting to proof of conviction of the crime." [Emphasis supplied.]

The words, "by means other than cross-examination of the witness," unmistakably indicate that, during cross-examination, impeachment is *not* restricted to offenses which have been the subject of conviction. The implication of the present wording is heightened by the absence in the 1949 Manual of any sort of reference to "means other than cross-examination." See paragraph 139*b*. Moreover the Legal and Legislative Basis, supra, observes expressly that "cross-examination is not limited by the general rule requiring proof of the conviction in order to impeach a witness by showing that he has committed a crime." See page 242.

In United States v. Long, 2 USCMA 60, 6 CMR 60, this Court commented that "the Manual for Courts-Martial, United States, 1951, appears to grant wide latitude to the cross-examiner," although we ruled there that the law officer had not abused his discretion in forbidding certain questions which had been offered. After detailed analysis, an Air Force board of review has concluded similarly that the Manual for Courts-Martial intended to establish an extremely broad scope of impeachment cross-examination. United States v. Dutey, supra. And the other Armed Services appear to have made similar rulings. United States v. Thacker [NCM 432], 4 CMR 432; United States

**677**

v. Peterson [CM 360770], 9 CMR 483, pet den 3 USCMA 815.

Of course, the cross-examiner's freedom is not limitless. We ruled in United States v. Hubbard, ■■■■■■ ■ supra, that cross-examination is improper when directed merely to bringing out that a witness was at one time suspected or accused of an offense. We held, therefore, that it was error to permit the interrogation of a witness as to whether he had previously been apprehended for a suspected offense by the Criminal Investigation Division. In the Long case we pointed out that the Manual "extends to the law officer the right to limit the examination to matters touching on worthiness of belief and to decide whether the subject matter sought to be elicited is too remote. . . . Every departure from the norm of human behavior may not be shown on the pretext that it affects credibility." If acts of misconduct are to be made the subject of inquiry, they must truly touch on worthiness of belief. United States v. Thacker, supra; United States v. Anderson, 13 CMR 829. To what point do these principles carry us with respect to the attempted cross-examination of Beaulieu?

The defense inquired concerning a confession of larceny. Larceny is certainly a crime involving ■■■■■■ ■ moral turpitude. Manual, paragraph 128b. A conviction of an offense involving moral turpitude may clearly be used to impeach a witness. Paragraph 153b. If, within the latter context, larceny is thought to impair credibility, we are sure that it falls within the purview of "acts of misconduct" which also affect credibility. We observe that cases from the several boards of review have taken an identical view. United States v. Dutey, supra; United States v. Peterson, supra. Incidentally, the Dutey case also held that all objection on the ground of remoteness was obviated by the cross-examiner's use of the word "recently." Here the question directed to Beaulieu respecting his prior confession of guilt of larceny contained this same word, and we are sure that

it is likewise unassailable on this ground.

In connection with a slightly different problem, we have pointed out that it is impermissible to use the prior acts of misconduct of an *accused* for the purpose of revealing a criminal disposition —from which the court-martial might infer that he had committed the offense for which he is being tried. United States v. Haimson, 5 USCMA 208, 17 CMR 208. The danger in allowing the use of such evidence is not to be found in its lack of relevance, but rather in the possibility that the members of the court may conclude that conviction and punishment are merited by the accused —regardless of whether they entertain reasonable doubt as to his guilt under the charge being heard. However, in the impeachment of an ordinary witness like Beaulieu—one who does not stand accused before the court-martial —slightly different considerations apply. There is no risk here that he will be convicted of an offense by reason of past misdeeds, because the court is without power to effect this result. Therefore, there is no necessary cause for holding that evidence of past misdeeds may not be brought out during the cross-examination of such a witness in order to develop the notion that perhaps he, rather than the accused, had performed the act which constituted the basis of the charge. In this area, of course, we must rely heavily on the discretion of the law officer in setting proper bounds. Yet we believe that, under the peculiar circumstances of the present case, it would have been error to exclude compelling evidence of a recent theft by Beaulieu—if it existed. In determining whether the accused or Beaulieu had robbed the present victim, the court, we are sure, was entitled to know that Beaulieu—who was found in possession of the stolen watch—had previously confessed to the commission of larceny, if he had, in fact, done so.

Appellate Government counsel have emphasized that the question directed to Beaulieu related to a *confession* of theft, rather than to an *act* of larceny. If such a distinction had been taken at the trial, the defense counsel would have experienced no difficulty whatever

in rewording the question. Moreover, for the present purpose, we do not find validity in the distinction urged by the Government. After all, it is frequently asserted that a confession is "the highest order of proof." While innocent men are often charged with misdeeds by others, rarely does one falsely accuse himself. A witness' confession to misconduct is much more than a suspicion of his guilt on the part of some other person. See United States v. Hubbard, supra. Moreover, with what situation are we faced if we are to assume that the confession is false? Indeed, that circumstance would seem to damn the witness' credibility almost as completely as would the existence of the misconduct to which he had confessed. Of course, a caveat must be interposed with respect to instances where the "confession" was clearly made in jest, or was involuntary. There the witness' self-incriminating statement cannot be regarded as a proper subject for cross-examination. However, such a situation is in no way raised by the record before us.

## IV

The question propounded to Nottingham with respect to whether he had previously been convicted ■ of a crime *involving moral turpitude* offers a problem akin to that found in United States v. Moore, 5 USCMA 687, 18 CMR 311. Clearly proof of a conviction of such an offense can be utilized to impeach a witness before a court-martial. Ibid. In connection with the wording of the inquiry, we observe that Federal cases permit a witness to be asked in general terms whether he has been convicted of a *felony*. See, e.g., Williams v. United States, 3 F2d 129 (CA 8th Cir); cf. United States v. Bills [CM 366778], 13 CMR 407. To be sure, the generality of the question propounded here presents exceptional difficulty for the witness in comprehending what crimes may fall within its purview. However, this uncertainty reflects no more than the vagueness which—as we observed in the Moore case—inheres in the phrase "moral turpitude." And the Manual for Courts-Martial uses this very term. See paragraph 153*b*. There-

fore, we see no alternative to permitting the cross-examiner to inquire in the general language used here. Indeed, if he were to ask the witness whether the latter had been convicted previously of a named crime, court members might readily infer that the cross-examiner possessed exact information that this was the case—else so specific a question would not have been used. The only remedy for the uncertainty found in a general query concerning prior convictions of felony, or of crimes involving moral turpitude, is to require the examiner, or the law officer, to seek to clarify the question, if the witness displays misunderstanding of the limits thereof.

The law officer here apparently worked from the premise that, to inquire whether Nottingham ■ had been previously convicted, defense counsel must have possessed definite information that this was the case. One dictum which seems to support this premise was furnished by the Court of Appeals for the Tenth Circuit:

". . . The trial court has a discretion in allowing cross-examination as to such convictions, and the questions should not be permitted unless the court is satisfied that they are asked in good faith and on substantial information—ordinarily only when the record proof of such conviction is available. See elaborate opinion of Judge Kenyon in Williams v. United States (CCA) 3 F2d 129, 41 ALR 328." [See Coulston v. United States, 51 F2d 178, footnote 3.]

In the present case the defense counsel had available no record proof of any sort of civilian conviction of Nottingham. And without reciting all of the pertinent circumstances we must acknowledge that the law officer should not be criticized for doubting at first blush the good faith of the defense counsel in their questioning of Nottingham with respect to a prior conviction.

However, in Williams v. United States, supra—a leading case, and one relied on in the quoted passage from the Coulston case, supra—the Court of Appeals for the Eighth Circuit rejected

the contention that a cross-examiner is required to possess an admissible record of prior conviction if he seeks to impeach a witness by such means. The Court reasoned that it would be absurd to forbid the examination of a witness concerning this former conviction because of the usual prohibition against secondary evidence. See also, Wigmore, Evidence, 3d ed, § 1270. Further, it was pointed out that counsel is not always informed of all witnesses who may be called against his client, and therefore frequently will not know the identity of the persons he should investigate for possible previous convictions. The court noted also the expense, difficulty, and delay in obtaining admissible evidence of previous convictions. However, by way of limitation it was stated:

". . . that the right to ask a witness on cross-examination the question whether he had been convicted of a felony, is subject to some extent to the regulatory, sound discretion of the court to prevent the abuse thereof. The question may be asked, not for the purpose of honestly discrediting the witness, but really to raise imputations against his character, where there is no foundation whatever therefor, in order to affect the jury, and hence there should be some discretion in the court to determine whether the question is asked for the purpose of honestly discrediting the witness or whether its purpose is merely to arouse unjust suspicion in the minds of the jurors. The difficulties and annoyances of the witness' chair should not be augmented by unwarranted insinuations or abuse perpetrated by means of cross-examination. There is no difficulty, we think, in a court holding an examination within bounds by the exercise of a sound discretion, and where the question is not asked with the honest purpose of discrediting the witness the court has it within its power in the exericse of such discretion to protect the witness and prevent unfair imputations. Our conclusion in the whole matter is that a witness may be asked on cross-examination, for the honest purpose of affecting credibility, whether he

has been convicted of a felony, subject to such limitation as the sound discretion of the court may dictate to prevent abuse of the right; that the questioner is bound by the reply, unless the record of conviction is produced to refute the answer of the witness." [Williams v. United States, supra.]

We are indeed inclined to doubt that so much of a limitation on the cross-examiner was intended in Williams as was suggested in Coulston, supra. Certainly the rationale of the Williams case would not support without distinct qualification a statement to the effect that a witness may be asked about a prior conviction "ordinarily only when the record proof of such conviction is available." Instead, the opinion seeks to demonstrate the hindrance to the cross-examiner which would result if he were required to have such proof at hand. To apply this restriction to such a general question as "Will you tell the court whether you were ever convicted of a felony?" or "Have you ever been convicted of a crime involving moral turpitude?" is palpably unnecessary. Any necessary content of insinuation in such a question is remote indeed. It is hard to see how the juror, or the court member, would be improperly affected in any way by the question if the witness denied the conviction, and if the inquiry were not repeated. The discomfort to the witness from such a question—phrased and voiced without insinuation—will normally be quite mild.

Moreover, to require positive information as a basis for such a general, nonaccusatory query would decrease markedly the leeway to which a cross-examiner is normally deemed entitled. That the questioner must be accorded latitude to probe into such matters—even those about which he lacks definite knowledge—is a principle deducible from the Manual's observation to the effect that:

". . . Counsel often cannot know in advance what pertinent facts may be brought out on cross-examination and for that reason it is to some extent exploratory. Reasonable latitude should be given the cross-ex-

aminer, even though he is unable to state to the court what facts his cross-examination is intended to develop." [Paragraph 149b(1).]

Too, the Supreme Court long ago noted that:

"Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply." [Alford v. United States, 282 US 687, 692, 75 L ed 624, 51 S Ct 218.]

And this Court has spoken as follows:

". . . The determination of the proper limits of cross-examination is within the sound discretion of the law officer, but we think it appropriate to point out that counsel should be accorded considerable latitude in such an examination. The right of cross-examination is a fundamental right and an invaluable means for determination of the truth; it should not be unnecessarily curtailed." [United States v. Hernandez, 4 USCMA 465, 16 CMR 39.]

It must be evident that the military lawyer needs the liberty to explore a witness' background, including possible previous convictions, fully as much as does his counterpart in the civilian scene. He, too, cannot always be sure of the identity of the persons who will be called by opposing attorneys to testify—although in military law administration there is less opportunity for the use of surprise witnesses, at least by the prosecution. And though the witness be known, there remains always the expense and difficulty of investigating him and thereafter of securing admissible evidence of previous convictions, if any. Indeed, the military practitioner will often be found in a less fortunate position than his civilian analogue in this regard. It will be observed, for example, that trial in the present case was held in Japan. How may defense counsel know of the jurisdictions in which he must inquire concerning a witness' past? And to secure necessary impeaching evidence will frequently require substantial continuances and delays—the very choice with which the law officer confronted counsel in the case at bar.

Actually a cross-examiner who knows of the existence of a prior conviction, and has at hand admissible proof of it, will have little reason to inquire of the witness concerning it—as an alternative, of course, to putting the record thereof in evidence. To be sure, there may result the dramatic effect of the witness' admission of criminality, or the possibility that he may deny the prior conviction and thereafter be trapped in an obvious falsehood. However, under the law officer's version of the law, this latter possibility may be minimized by astute counsel through tendering prompt objection to the interrogatory—and thus, in a measure requiring the questioner to disclose his purpose to the witness.

With an eye to the latitude intended for the cross-examiner, together with the difficulty of investigating the backgrounds of prospective witnesses, we must hold that in military law the former may inquire—by questions which do not mask an allegation—into the possible prior conviction of a witness of an offense involving moral turpitude, or otherwise affecting credibility, regardless of a want of definite information concerning the witness' past record. Of course, a denial of such a conviction is binding on the examiner—unless the latter is able to produce admissible evidence of a judicial determination of guilt. See United States v. Russell, 3 USCMA 696, 14 CMR 114; Williams v. United States, supra.

V

Our inquiry, though, cannot terminate at this point—in view of the style of the questions used. As ██ was mentioned at the trial with reference to the first of the two disputed inquiries, the query in reality amounted to an allegation. In United States v. Russell, supra, we inveighed against this practice. There the accused was asked " 'Isn't it a fact that you were convicted of highway robbery as a civilian.' " We commented:

"In the case at bar, the accused was not asked a general question concerning conviction of a felony. The question was put to the accused in such a manner as to suggest that the trial counsel was in possession of damaging information concerning him. It was, therefore, an affirmative statement not simply an interrogation."

Similarly in United States v. Long, supra, we indicated that a law officer might properly preclude a cross-examiner from impairing "the credibility of a witness by repeated innuendoes and insinuations rather than by accepted methods of cross-examination." And in United States v. Bills, supra, a board of review reasoned that it was error for trial counsel repeatedly to inquire of the accused whether he had been convicted of a felony in civilian life after he had initially denied it.

The board commented:

". . . We realize that judicious use of repetitious questioning to test credibility is a common tactic of cross-examination—with the concurrent disadvantage to the cross-examiner that consistent answers can also strengthen, instead of weaken, credibility, but we conclude that after counsel had once asked the question and being bound by the answer, unless refuted by a record of conviction (Williams v. United States, supra), repetition of the question regarding conviction of a felony was error."

The questions directed to both Beaulieu and Nottingham were—we are sure—objectionable from this standpoint. Cf. Speiller v. United States, 31 F2d 682 (CA 3d Cir); Oliver v. United States, 202 F2d 521 (CA 6th Cir); Mercer v. United States, 14 F2d 281 (CA 3d Cir); United States v. Nettl, 121 F2d 927 (CA 3d Cir); Bolling v. United States, 18 F2d 863 (CA 4th Cir). In light of the authority vested in a trial judge, or a law officer, to protect a witness from abuse, the law officer here was, in our opinion, fully justified in requiring, as a prelude to admitting the question directed to Nottingham in an accusatory form, that the cross-examiner have available admissible evidence of a prior conviction, for introduction in case of a denial. It was exactly this sort of inquiry we believe to have been envisaged in the suggestion found in Coulston v. United States, supra, to the effect that "ordinarily" the questioner must have available admissible evidence of the prior conviction. In short, we have no doubt that the law officer could appropriately have rejected the two questions objected to by trial counsel in the form in which they were offered.

Unfortunately, though, the words of the law officer in upholding the objections to the questions to Beaulieu and Nottingham render it distinctly uncertain that he considered that the flaw in them lay solely in their accusatory form. In fact, we believe that the defense counsel in the case at bar could, and would, reasonably have inferred from the former's remarks that they were precluded from inquiring into Beaulieu's confession of larceny—whatever the form of the question used—unless they were able to show that the witness had been convicted of the misdeed confessed. Similarly, they could reasonably have considered that any interrogation—in whatever form—of Nottingham, with respect to a prior conviction of an offense involving moral turpitude, would not be permitted in the absence of definite information regarding the existence of such a conviction.

It may be suggested that defense counsel should have tested the bounds of the law officer's ruling by propounding his questions in another style. This proposal—however proper in the usual case—is believed to be inappropriate here. At the outset of the trial, defense counsel had been sharply rebuked by the law officer for what the latter regarded—and quite properly—as a questionable tactic, indeed one which approached an attempt to intimidate a prosecution witness. The sanction of a contempt citation was at that time placed unmistakably before the eyes of the defense lawyer and his assistant. Under these circumstances, we doubt that it should be demanded that counsel experiment with the limits of the law officer's rulings.

682

With respect to the cross-examination of Nottingham, it has also been argued that the defense forfeited its right to claim error on appeal by reason of its failure to protest strenuously the law officer's offer to continue the trial for three weeks. This continuance would have permitted a letter of inquiry addressed to vaguely defined sources within the United States with respect to previous convictions on the part of the witness. The law officer's proposal placed defense attorneys in the dilemma of being required to elect between a substantial—and probably fruitless—delay in the proceedings, on the one hand, and the loss of an opportunity to inquire into Nottingham's past, on the other. In this dilemma—stemming from the law officer's erroneous premise—we are unwilling to find a basis for waiver.

## VI

Since we find error in the restriction of cross-examination here, we must inquire whether the accused ▮ was prejudiced thereby. Concerning the second charge—that of assault—we are sure that he was not harmed. In addition to Beaulieu and Nottingham, who testified to Berthiaume's role in the assault, Basinger appeared as a prosecution witness. His testimony was wholly unimpeached, and no evidence was forthcoming from either prosecution or defense which served to contradict the accused's responsibility for this act. The only matter left in doubt by the evidence was whether Berthiaume accomplished the assault alone or with the help of others—in either of which events he would stand guilty as charged.

On the charge of robbery, however, we must reach a different result. The Japanese victim did not identify his assailant. Basinger's testimony did not relate to this charge in any significant way. The testimony of both Beaulieu and Nottingham suffers from the infirmity of being too palpably self-serving. And most important, the stolen property was not found in the possession of the accused, but instead was discovered in the wall locker of Beaulieu. Consequently, we cannot be at all sure that the restrictions on the cross-examination of the prosecution's two witnesses did not ultimately turn the balance against the accused. We recognize, of course, that although Beaulieu originally may have taken the stolen property from the victim—as suggested by his subsequent possession thereof—Berthiaume might be responsible for the robbery as an aider and abettor. See Manual for Courts-Martial, paragraph 138a. This possibility, however, must be explored at a rehearing, and not at this level.

## VII

In light of the foregoing, we affirm only the findings of guilty of a violation of Article 128 of the Uniform Code, and return the record of trial to The Judge Advocate General, United States Army. Two courses appear to be open to him. He may transmit the record to a board of review for reassessment of sentence, or, in the alternative, a rehearing under the robbery charge must be held. See United States v. Field, 5 USCMA 379, 18 CMR 3.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

## I

I am unable to concur in the majority opinion for the reason that the law officer ruled correctly, albeit, he may have assigned an incorrect basis for his ruling. Furthermore, in this instance, both appointed and individually selected defense counsel waived any right to claim error on appeal. However, before dealing specifically with those points, I prefer to make one or two general observations.

## II

During the cross-examination of Corporal Beaulieu, a prosecution witness, he was asked whether he had recently confessed to stealing a radio. An objection to the question by trial counsel was sustained. After some argument over the matter, defense counsel abandoned that line of attack, made no offer of proof on the issue, and the record is silent as to any basis in fact for the question. Later, another prosecution

witness, Private First Class Nottingham, was asked whether in civilian life he had been convicted of a crime involving moral turpitude. Again an objection was lodged, it was sustained conditionally, but this time defense counsel pursued the matter during an out-of-court hearing. At that time, they conceded they had no reliable information that Nottingham had ever been convicted of any crime, but stated there was. a rumor circulating in his unit to the effect that he had entered the service "on some sort of parole out of some sort of prison." Defense counsel intimated that they would be inclined to ask for a one-month continuance if the objection to their question was sustained. The law officer countered by offering them three weeks time in which to determine whether there was any substance to the rumor. Counsel replied that the law officer's solution was founded in wisdom and might be accepted by them. They, however, apparently lost their fervor for the continuance as no subsequent request was made. At least, that indicates a desire not to continue their attack.

### III

As a general proposition of evidentiary law, any question asked a witness should be definite and specific. Those which are so broad that they fail to put a witness on notice of the area in which the questioner is operating are improper, and, if a timely objection is made, the law officer should not allow the witness to answer. Then, too, when a question is so vague and uncertain that its answer may require the witness to disclose incompetent evidence, it should not be answered. Lastly, when counsel are advised that the question asked is improper in form and they are afforded a reasonable opportunity to pursue the line of inquiry, the question should be rephrased. In Bundy v. United States, 193 F2d 694, 695 (CA DC Cir 1951), cert den 343 US 908, 72 S Ct 638, 96 L ed 1326, the principal witness for the prosecution was asked on cross-examination whether she had been convicted of certain felonies during the years 1938 through 1941. An objection to the question was sustained on the ground it was too general, but counsel failed to pursue the interrogation. The trial court's discretion in sustaining the objection was affirmed on appeal.

My associates refer to United States v. Haimson, 5 USCMA 208, 17 CMR 208. There we observed that it was not proper to use the prior acts of misconduct of an accused for the sole purpose of revealing a criminal disposition. The danger in that sort of showing is the possibility that the court-martial might infer solely from that evidence that the accused had committed an offense for which he is being tried. Because of the reason underlying that principle, it is apparent that it does not apply to a witness who is not an accused. But even though not falling within that rule, there is a requirement of fair play and it is improper on cross-examination to elicit prior acts of misconduct merely to degrade, harass, annoy, or humiliate a witness. Manual for Courts-Martial, United States, 1951, paragraph 149b, page 279. I may suggest at this point that a witness who takes the witness stand is subject to some protection from an imputation of the commission of previous crimes, particularly when counsel doing the cross-examination, when called upon to do so, acknowledges that he lacks credible information upon which to found a reasonable belief that any crimes have been committed. A witness, not standing trial, may not be prejudiced to the same extent as an accused by improper questions couched as imputations and unfounded accusations, but he is entitled to some degree of protection.

I am unwilling to give blanket approval to the revelation of all prior acts of misconduct on cross-examination. "Every departure from the norm of human behavior may not be shown on a pretext that it affects credibility." United States v. Long, 2 USCMA 60, 70, 6 CMR 60, 70. Nor, may such a departure be shown where it is so remote that its effect on credibility is relatively slight. The Manual for Courts-Martial, United States, 1951, paragraph 149b,

requires that law officers make value judgments in this field and I prefer to affirm them when they consciously weigh the evidence sought to be produced and have a basis for concluding that it is immaterial or incompetent. Thus, where the question is so general in scope that it may require the disclosure of incidents of many years past which may have no reasonable relationship to the present truth and veracity of a witness, an objection should be sustained. Furthermore, to assure that the witness is not being required to disclose incompetent, irrelevant, or immaterial information, the question should be specific enough as to time, date, place, or details to furnish the law officer with a predicate for his ruling. By way of illustration, I think it well to consider the second question involved in this appeal. The question could cover any conviction for an act of misconduct involving moral turpitude from birth until trial. Even the disclosure of a petty theft as a boy was encompassed within its coverage. Furthermore, if the witness knew the extent of the phrase "involving moral turpitude," he had a better understanding of the law than most lawyers. If the purpose of that question was not intended to result in confusion and despair for the witness, then I misunderstand its objective.

In making these general observations, I have not overlooked the contention that the law officer did not exclude the questions asked of Beaulieu because he thought them too vague, indefinite, and uncertain. His assigned reason was he believed that only a conviction would be admissible for impeachment purposes. Conceding a mistaken belief on his part, implicit in the contention advanced here is the mistaken notion that in some way an accused is prejudiced if we sustain a law officer who reaches a right result for a wrong reason. I believe the authorities are legion to the effect that if the ruling of a trial judge was right, an appellate court will not reverse even though the reason assigned be wrong. Smith v. United States, 173 F2d 181, 185 (CA 9th Cir 1949); Christoffel v. United States, 200 F2d 734, 742 (CA DC Cir 1952), vacated and remanded for resentencing on other grounds, 345 US 947, 73 S Ct 868, 97 L ed 1371. There may be some exceptions to that general rule, but they involve questions not material to this decision.

## IV

Having set forth some of the general principles which I believe applicable to the issues which confront us, I turn now to the merits of the law officer's ruling in sustaining an objection to the question asked the witness Beaulieu concerning a recent confession of larceny. While I have no desire to debate the statement that a confession is the highest order of proof, I cannot subscribe to the proposition that a witness properly may be asked whether he confessed to a crime. Let us suppose for a moment that a witness has made such a confession. In view of the present holding, he must admit having done so without regard to whether the confession was made to a clergyman as a penitent, to his wife, before a grand jury, or to the very counsel cross-examining him at a time when that attorney may have been his counsel in an action involving the very crime upon which he is being questioned. It is a dangerous doctrine to permit an invasion in the field of privileged communication by resort to all inclusive questions on cross-examination, yet I find no sort of exception in the question asked and certainly none reserved by the majority in the opinion. Nor is it only in the field of privileged communication that the doctrine of the majority is unsound. If the witness had not been tried for the supposed offense, and, if he appeared to be uninformed, he ought to be instructed on his rights under Article 31 of the Code, 50 USC § 602. Moreover, suppose he had confessed because of inducement, coercion, or even physical violence. Are we to open the flood gates and permit those collateral issues to be litigated on the trial of a third party? I merely touch the surface, but I suppose the answer to my contentions will be that the law officer should have pointed out the objectionable features of the question and then a correct approach, if any, could have been made by defense counsel.

From my point of view, both the form and substance of the question rendered it incompetent and the law officer was under no duty to instruct defense counsel on the art of cross-examination. Certainly, they have some obligation to know the rules of evidence.

Even were I to suppose that the question asked of Beaulieu was sufficiently certain and specific to re- ▮▮▮▮ quire an answer, I would find still another ground which would justify the ruling of the law officer. I agree that the commission of an act of larceny might impair the worthiness of belief of an ordinary witness and· that it may, therefore, be shown on cross-examination. Larceny falls in the category of crimes directly involving truth and veracity, such as perjury, forgery, and fraud. Wigmore, Evidence, 3d ed, § 982. However, I find no showing in this record as to what the anticipated answer of the witness might have been. Without any offer of proof or without any assertion on the part of defense counsel that he expects an affirmative answer, I find no reason to assume that the law officer erred. A question which is asked merely to arouse unjust suspicion in the minds of court members is not admissible, and absent some showing contained in an offer of proof or even in a statement of counsel, that there existed a reasonable possibility that the witness had committed an offense which would cast doubt on his veracity, then a ruling sustaining the objection is not erroneous.

### V

The question asked of Private First Class Nottingham concerned itself with whether the witness, while ▮▮▮▮ in civilian life, had ever been convicted of an offense involving moral turpitude. I have previously expressed the view that this question was much too vague, uncertain, indefinite and remote to require an answer. However, for the present purposes, I am willing to assume that the verbalization used was sufficiently precise for trial purposes. We have previously held that proof of a conviction of such an offense may be used to impeach a witness, United States v. Moore, 5 USCMA 687, 18 CMR 311, and so the subject matter of this question was a proper subject for inquiry. Thus, I may assume that the law officer erred in sustaining the objection, but the error in that regard was clearly waived. In an out-of-court conference, defense counsel conceded that the information they possessed was no more than idle gossip. They advised the law officer they had no information as to what offense, if any, was involved; that the time was unknown; and that the place was not identified. As a matter of fact, they could not frame a question which would fix the mind of the witness on the particular information sought to be elicited. Upon that weak showing, the law officer decided to assist the cause of the accused and offered a three-week continuance to his counsel, thus affording them an opportunity to make certain and definite that which existed only in speculation and conjecture. To me, the information offered in support of the question indicated that defense counsel had nothing more upon which to base his question than a faint hope that Nottingham had previously run afoul of the law. I concede that reasonable latitude must be given a cross-examiner and I would not require that he be in possession of definite admissible evidence of the fact of conviction. Alford v. United States, 282 US 687, 692, 51 S Ct 218, 75 L ed 624. However, I believe it reasonable to insist that there be some basis for the question asked. So far as this record is concerned, I am left with no idea of what the nature of the offense might be. More to the point, in answer to the law officer's offer to continue the matter for three weeks, defense counsel stated that the law officer had chosen a wise course and that, if necessary, a request for continuance would be made. Had the offer been accepted, then or later, the extension of time would have permitted a thorough search for the unknown evidence, and the objectionable features of the question asked then removed. Counsel did not see fit to pursue that course and I would, therefore, conclude they knowingly and consciously waived their rights to raise the error on appeal.

## VI

To remove any doubts about there being any miscarriage of justice arising out of the failure of the law officer to permit the questions to be answered, I dwell briefly on the facts and circumstances showing an absence of material prejudice. My associates say the questions, if answered, might have affected the credibility of the two witnesses. My answer to that is the witnesses themselves seriously weakened that personal characteristic without any aid from defense counsel, and they were aided and abetted by the in-court statements of trial counsel. Both conceded being drunk, and they were involved in a drunken brawl in a bar. Beaulieu admitted that coincidental with the robbery, he received its fruits. The record shows his repuation for truth and veracity was bad. Nottingham was shown to have participated in the assault, and he fled to escape detection. The record discloses that Beaulieu had been charged with the same offenses as was the accused, and trial counsel, in his closing arguments, stated that the two witnesses did not come into the court with clean hands and he felt certain that anyone who had anything to do with these two criminal acts would be brought to trial by general court-martial. My associates affirm one finding which would amply support the sentence imposed, but they contend there may have been prejudice on the robbery specification. If the witness Beaulieu was interested in shifting the blame solely to the accused, the court-martial was fully apprised of that fact. Furthermore, there is some evidence which corroborates the testimony that the accused gave the watch to Beaulieu. At least, a witness observed that something was handed from the latter to the former immediately following the first assault. If the court-martial was not fully apprised of the fact that all of the participating witnesses were persons of doubtful veracity, then I misread this record. Bias, interest, lack of memory, intoxication, joint participation in the assault and robbery, bad character, and lack of credibility were all presented to the court. There was no conflict in testimony, as no evidence was offered on behalf of the accused; and in what way any favorable answers to the questions would have materially weakened the Government's case or strengthened that of the accused, I am unable to ascertain. The victims' testimony was certain on all elements excepting identity; the evidence was conclusive that the accused was present on both occasions; the times and places are fixed; and the three other participants tagged the accused as the principal actor. While their testimony was seriously impeached, not one disputing fact is present in the record to challenge their statements.

I would, therefore, affirm both findings and the sentence.