UNITED STATES, Appellee

v

JAMES R. BRITT, Sergeant, U. S. Army, Appellant

10 USCMA 557, 28 CMR 123

No. 12,790

Decided July 31, 1959

*First Lieutenant Richard P. Nee* argued the cause for Appellant, Accused. With him on the brief was *Major Edward Fenig.*

*First Lieutenant Allen I. Saeks* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. Mc-Conaughy* and *First Lieutenant Renald A. Manetti.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of receiving four automobile tires which he knew to be stolen, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. Intermediate appellate authorities affirmed, and we granted review to consider whether the accused was prejudiced by certain actions of trial counsel.

At trial, the principal Government witness was Corporal L. J. Riley, Jr. He testified that in the evening of June 10, 1958, he stole the tires and hubcaps from a Chevrolet car parked outside Outpost 3, Fort Leonard Wood, Missouri. He took them to the home of Private First Class Haakinson and left them overnight. The next morning he brought the articles to the accused's home, in the town of Devil's Elbow, Missouri. Purportedly, he informed the accused he "took the tires off a car" and "indicate[d]" that he did not "have any permission" to take them. On cross-examination he admitted that on July 1 he gave a statement to a Criminal Investigations Department agent in which he said that when he took the tires to the accused's home he merely told him he "wanted to leave some tires there for a day or so." He gave the accused "no inclination [sic] as to where they came from." He attributed the change in his account of the incident to the fact that he originally "tried to

take the whole blame." Before the investigation started he told the accused "to get rid . . . [of the tires], throw them in the river, do anything." A few days later the accused told him he had sold the tires. This and other "circumstances" persuaded him to change his mind and tell the truth. Riley also admitted at the time of trial he was awaiting action by the convening authority on his conviction of the larceny of the tires and that he knew "it was possible" his sentence might be reduced because he testified for the Government.

The accused testified in his own behalf. He said that when Riley brought the tires to his house he told him "he wanted to leave them there . . . because he didn't have a place where he could keep them in the company." Riley put two tires on his car and left the other two at the house. A few days later he returned. He and Sergeant Elkins washed and painted the rims of the tires. They left them at the house to dry. Riley then went on leave. After his return he met the accused in the company area and told him "to get rid" of the tires. Since Riley owed him money and he needed funds for the payment of some of his bills, he sold the tires.

On cross-examination trial counsel asked the accused a series of fifty-seven questions. The first three merely pertained to the accused's name, service, and organization. The next twenty-four questions related to the offense charged; of these, nine were essentially repetitious. The remaining thirty questions had nothing to do with the offense for which the accused was on trial. Instead, they were designed to impeach the accused by other purported acts of misconduct. He was asked if he was "accustomed" to selling things without the "consent of the owner"; whether he had sold mirrors to Sergeant Elkins and to Specialist Munson; whether he stole "wheels and tires off a car at Theater 1 in January of this year"; whether he had stolen clothing from "cars parked at the NCO Academy"; whether he had stolen a spotlight off a car; whether he stole a spotlight from a fire engine; whether he stole a battery from a car; did he "ever strip any cars outside the main gate"; did he steal a water pump from the golf course in the Spring; whether he stole the hubcaps that were on a car which he traded; whether he stole fender skirts from a car at Service Club 4; did he "strip a '51 or '52 Chevrolet and take a fuel pump" and other items; did he steal a radio from a "wrecked" car belonging to Tarabolski.

After the accused was excused as a witness, the law officer instructed the court-martial that since the prosecution did not present any evidence "to prove any of the offenses that he asked about," the prosecution was bound by the witness' answers. He advised the court that it was not to "draw any inferences from the fact those questions were asked."

In closing argument, defense counsel referred to trial counsel's cross-examination. He charged trial counsel with asking the accused "about every offense on the MP blotter for several months." He asked the court to recall the law officer's "admonition" and maintained that if the prosecution had evidence of the "additional charges," it would certainly present it. In rebuttal, trial counsel argued that the defense "made a great issue" of the fact that the Government had not "proved any prior charges." He called attention to the accused's denial of "knowledge of these things" and the Government's failure to produce evidence. He concluded his argument as follows:

"However, the defense knows the reason for that, he knows that the rules of evidence provide that prior acts of misconduct not amounting to conviction are not admissible. That is the law. I assure you that I do not wish you to consider that, and the law officer has instructed you that you will not consider any part of that examination, and I don't want you to."

A final reference to the other "alleged offenses" was made by the law officer at the end of his general instructions. After a side bar conference with counsel, he told the court he had been asked "to repeat" his earlier

instructions. He advised the court that the prosecution was bound by the accused's answer and "the court must consider, since the answers were negative, that the accused had not done any of the things he was asked about."

An accused, like any witness, may be impeached on cross-examination by showing he has committed a crime which involves moral turpitude or affects his credibility. United States v Moreno, 10 USCMA 406, 408, 27 CMR 480. In a number of cases we have indicated that paragraph 153b of the Manual for Courts-Martial, United States, 1951, provides a broader basis for impeachment of a witness than obtains generally in the Federal courts in that the act of misconduct need not be followed by conviction. United States v Berthiaume, 5 USCMA 669, 18 CMR 293; United States v Hutchins, 6 USCMA 17, 19 CMR 143. In some cases we "assumed," for the purposes of the particular case, that the broad rule applied to the accused as well as to other witnesses. United States v Hubbard, 5 USCMA 525, 529, 18 CMR 149. However, some time ago we called attention to the provisions of paragraph 138g of the Manual which pertain specifically to impeachment of the accused. That paragraph reads as follows:

> "If the accused takes the stand as a witness, his credibility may be attacked as in the case of other witnesses. For this purpose, it may be shown that he has been convicted of a crime involving moral turpitude or otherwise affecting his credibility. See 153b (2) (b)."

We observed that under a literal reading of the above paragraph impeachment of an accused is limited to instances of misconduct, involving moral turpitude or affecting credibility, which are followed by conviction. United States v Harris, 9 USCMA 493, 496, 26 CMR 273. This was the rule in the 1928 and 1949 Manuals. Manual for Courts-Martial, U. S. Army, 1928, paragraph 124b; Manual for Courts-Martial, U. S. Army, 1949, paragraph 139b. Indeed, there are cogent reasons for differentiating in this area between the accused and other witnesses. United States v Berthiaume, supra, page 678; United States v Moore, 5 USCMA 687, 18 CMR 311; Wigmore, Evidence, 3d ed, § 983 (4). Since we have not had the benefit of argument on the point and it is unnecessary to the disposition of the case, we put aside the matter for the present. It is appropriate, however, to observe that we view with increasing concern the lack of "discrimination in attempted impeachment" on the part of Government counsel. United States v Moreno, supra, page 409.

In United States v Shepherd, 9 USCMA 90, 25 CMR 352, we held that impeachment must be predicated upon the possession of facts "which support a genuine conviction" that the witness committed an act involving moral turpitude or affecting his credibility. The Government contends the offenses here dealt with activities "which would have occurred at or near the Post at a reasonably short time" before trial. If that is the fact, it presents an almost unbelievable situation.

Military law contemplates that all known offenses committed by an accused be joined in a single charge sheet and be referred to a single court-martial for trial at the same time. Manual for Courts-Martial, United States, 1951, paragraph 33h; United States v Keith, 1 USCMA 442, 448, 4 CMR 34. Other offenses uncovered in the course of an investigation can be joined with the original charge on the same charge sheet. Manual for Courts-Martial, supra, paragraphs 24, 32c. Since no other charges were referred to trial, it is difficult to conclude that trial counsel had possession of facts "to support a genuine conviction of guilt" of other alleged misdeeds which were committed, as the Government maintains, at or near the Post. On the contrary, in our opinion, the purported times, places, and nature of the offenses, along with the form of many of trial counsel's questions, show clearly that they were at best no more than allegations of wrongdoing. See United States v Berthiaume, supra, page 681.

We have strongly condemned the use of suspicion or allegation of wrongdoing as a substitute for the fact of misconduct. See United States v Hubbard, supra; United States v Shepherd, supra. We considered a similar situation in United States v Russell, 3 USCMA 696, 702, 14 CMR 114. There the accused was asked: "Isn't it a fact that you were convicted of highway robbery as a civilian?" We held that the question was improper. In part we said:

> "In the case at bar, the accused was not asked a general question concerning conviction of a felony. The question was put to the accused in such a manner as to suggest that the trial counsel was in possession of damaging information concerning him."

We conclude that the examination of the accused by trial counsel on other alleged acts of misconduct was improper. The remaining question is whether the accused was prejudiced by the error.

An instruction by the law officer to the court-martial to disregard an attempted impeachment is generally sufficient to eliminate the possibility of harm to the accused. United States v Moreno, supra. But each case must be considered on its own facts. Here the catalog of alleged misdeeds is so numerous and so closely related to the offense charged that we believe there was at least a fair risk the improper examination influenced the court-martial, especially in view of trial counsel's argument that only the "rules of evidence" prevented the admission of evidence of other misdeeds by the accused. In this circumstance, the cautionary instruction could hardly overcome the adverse effect of the examination. United States v Shepherd, supra, page 905. Also the evidence of guilt of the offense is not so compelling as to lead inescapably to the conclusion that the impeachment evidence had no influence on the verdict. Cf. United States v Russell, supra.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside. A rehearing may be ordered.

Judge FERGUSON concurs.

Judge LATIMER concurs in the result.