UNITED STATES, Appellee

v

DOUGLAS E. WALLER, Private First Class,
U. S. Army, Appellant

11 USCMA 295, 29 CMR 111

296

*First Lieutenant Robert D. Stiles* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel W. H. Blackmarr* and *Captain Arnold I. Melnick.*

*First Lieutenant George J. Miller* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy* and *First Lieutenant Paul R. Walsh.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

The accused was tried by general court-martial for rape and sodomy, in violation of Articles 120 and 125 of the Uniform Code of Military Justice, 10 USC §§ 920 and 925, respectively. He was found guilty on both counts and was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for seven years. The convening authority and board of review approved the findings and sentence, and we granted accused's petition to this Court to consider the three following assignments of error:

Whether the law officer erroneously limited defense counsel in his cross-examination of the victim.

Whether the search of appellant's wall locker and the seizure of its contents by Criminal Investigation Detachment agents was illegal and appellant's subsequent confession was involuntary and erroneously admitted into evidence.

Whether the instructions on considering the confession were correct.

The issues will be considered in the order stated, and the facts necessary to a resolution of the questions involved will be stated as each is discussed. For the purpose of orientation, however, we do mention that the sufficiency of the evidence to support the findings of guilt is not involved. The act of intercourse is not in dispute, and the sole issue dividing the parties was whether there was consent on the part of the prosecutrix. The accused's pretrial statement, the victim's testimony, and the independent physical evidence showing force and violence support the findings of guilty of the two offenses.

### II

The first assigned error asserts that the law officer erred when he restricted the defense counsel in the cross-examination of the prosecutrix. The facts material to that issue are these. During the course of his cross-examination of the victim, defense counsel asked the following questions and received these answers:

"Q Do you know anybody by the name of William Boyd?

"A No, sir.

"Q Did you ever hear that name before?

"A No, sir.

"Q Who is William Boyd?

"A It's a fictitious name that somebody gave me at Fort McLellan [sic].

"Q What were the circumstances upon which this fictitious name was given to you in Fort McLellan [sic]?"

An objection was lodged by trial counsel at that juncture, and the law officer ordered an out-of-court hearing to consider the length to which he would let defense counsel pursue his inquiry. At this hearing, trial counsel requested that the defense make known the purpose of his cross-examination. Defense counsel replied substantially that he did not intend to tip his hand at that time. The

law officer then inquired whether the defense intended to show a prior trial for, or conviction of, any offense. Defense counsel replied that he could not produce evidence to that effect but he could show the prosecutrix had on prior occasions made an unwarranted complaint about the conduct of a third party. He admitted his examination would not shed any light on the chastity of the victim, but he thought it might impair her credibility. To present his view in its proper perspective, he offered to disclose his theory and supporting evidence to the law officer in the absence of the prosecution. Trial counsel agreed to the procedure, and a document reflecting the alleged misconduct was handed to the law officer. It is the entries in this exhibit which defense counsel used to support his contention that the proposed cross-examination was proper. An inspection of that document, which is a part of the record, shows it to be a copy of a complaint report filed with a military police unit some sixty days prior to the offenses herein involved. The entries in the report show that at Fort McClellan, Alabama, this same victim requested an investigation of an incident in which a certain William Boyd invited her to go inside a WAC chapel. She refused, and he forced her into the building and attempted to kiss her. She was unwilling and, after some twenty minutes of opposing his advances, they both left, going their own separate ways. On the form is a statement that a check with the post locator shows no person by the name of William Boyd on the post, and the evaluation column is marked opposite the word "UNFOUNDED."

The cross-examination involved a prior collateral occurrence, and the only point in issue is whether ▇▇▇▇▇▇▇ ▇ the law officer abused his discretion in not permitting defense counsel to bring before the court the facts shown in the exhibit. In United States v Long, 2 USCMA 60, 6 CMR 60, and United States v Hubbard, 5 USCMA 525, 18 CMR 149, we held that a law officer does not abuse his discretion when he bars cross-examination on prior acts which have no reasonable tendency to impair the credi-

bility of a witness except by innuendoes and insinuations. Here defense counsel was seeking to go into a side issue which had for its purpose a showing that the prosecutrix had filed with a military police unit an unfounded complaint against another party. The potentialities for confusion are certainly rampant in that kind of an inquiry. At best, that controversy would revolve around some unknown party's conclusion that the prosecutrix had no reason to complain. It is noteworthy to mention that while defense counsel contended he could show the complaint was unfounded, it is obvious he had to support his contention by relying upon the rankest sort of hearsay evidence. The prior incident happened at Fort McClellan, Alabama, and the particular offense with which we are involved in the instant case occurred at Fort Jay, New York. The individual who executed the report and made the evaluation is not identified, the source of that particular bit of information is not disclosed, and the value of the document for cross-examination purposes would hinge entirely upon whether the person who accompanied the victim on that occasion had used a fictitious name. The evidence produced up to the time of the out-of-court hearing showed that to be the fact. It would thus appear that had the cross-examination been permitted, it would have elicited evidence of a collateral act which could not possibly be connected up with any misbehavior. Had the law officer opened up that avenue of approach to lack of credibility, nothing of a discrediting nature could have been shown and a diversionary dispute of no relevancy to the witness' veracity would have been the result. Accordingly, we do not believe he abused his discretion in his ruling.

III

The next issue involves two separate questions, only one of which we will answer. The first part of the issue raises the question of whether the search of appellant's wall locker and the seizure of certain clothing were illegal. This question was considered specifically by the law officer, the staff judge advocate, and the board of re-

298

view. Each of them sustained the search and seizure as being reasonable, but each assigned different reasons for their holdings. We see no good purpose in resolving their differences or in answering the question for, in our opinion, it makes no difference whether the search and seizure were legal or illegal. It is arguable that they could be found reasonable upon any one of three separate grounds; namely, the property was seized incident to a legal apprehension; the wall locker was open and the articles clearly visible; or, the search was authorized. We merely point out these possibilities to indicate we are not faced with a situation where the acts of the military authorities in obtaining possession of the property were so aggravated that sanctions must be employed by us. We do, however, pretermit discussion of those theories because we prefer to assume arguendo that the search and seizure were illegal and decide the case on other grounds.

Accepting the premise outlined above, we first dispose of the principle that the apparel could not be introduced in evidence because it was obtained illegally. That argument might have merit under a different factual setting, but here the tactics of the defense make that rule inapplicable. The Government did not offer any of the seized articles in evidence. It was counsel for the accused who made use of the victim's clothing for, in his cross-examination of a criminal investigator, a discrepancy was brought out about the presence of blood on her clothing and the defense offered it in evidence to show the absence of stains. His efforts had a tendency to impeach the witness, and there was no error in that about which the accused can complain. As to the articles of clothing worn by the accused, they were never produced in the courtroom, for the parties stipulated they had been forwarded to a laboratory for analysis of certain stains. The findings were admitted, but the articles were not, and accused cannot assert error in the admission into evidence of a stipulation in which he voluntarily joined and which he used to partially support his theory.

With those preliminary matters out of the way, we move on to discuss the real issue dividing the parties, and that is whether the accused's pretrial confession was rendered involuntary by the seizure. When he made his first statement, accused conceded his guilt but, when he became a witness at the trial, he had changed his story and consent by the prosecutrix became his principal line of defense. As a result of accused's recantation, the voluntariness of his confession becomes of critical importance, and it is on this aspect of the case that we must consider the assumed illegal seizure. The Government carried its burden and proved beyond all reasonable doubt that the confession was voluntary, provided the evidence of the accused did not weaken the showing made. He testified on two occasions, and this is his testimony on involuntariness. He was taken to the company commander's office and was arrested there by a Mr. Hardin on a charge of rape. The apprehending officer had a rolled bundle of clothing in his hand and the accused recognized his trousers. He did not see the other clothing at that time, but he concluded the victim's undergarment was rolled up on the inside. He was confused and upset at the time because of being informed he was suspected of rape. He was taken to Criminal Investigation Detachment headquarters, some considerable distance from the place of apprehension, where about one and one-half hours later he admitted committing the crimes. He did not see the clothing at this interview until after he had completed his confession. In response to questions by his counsel, he answered as follows:

"Q . . . Were you afraid for some reason?

"A A little bit afraid.

"Q Why?

"A Of what might happen to this. A possibility they might put me in the stockade, and that I felt that I was completely innocent of the charges they had placed against me. It was just in the fear state of mind and I didn't exactly know what to think.

"Q Did the fact that the clothes were there make you afraid?

"A little bit, sir, because — —

"TRIAL COUNSEL: The witness just testified, sir, that he didn't see the clothes until after he made his statement. Now Lieutenant Kunin is sort of putting words in his mouth.

"Q Was the fact that you had seen the clothes in Mr. Hardin's hand at the time you were first arrested— was that anything to make you feel any way? Will you tell the court how you felt in relationship — —

"A When I come in that night I knew that my trousers had blood on them, and then when I saw them in his hands that morning I knew that it would hurt me in some way, him having them trousers.

"Q Would this have caused you to sign any statements or anything like that?

"A Yes, sir. I was willing to make a statement.

"Q Thank you."

After testifying that he was not threatened by the investigators and that no compulsion was used, he was interrogated by a court member. On this examination, he offered the explanation contained in these answers:

"Q And you were frightened?

"A Well, I was put in a state of mind of shock.

"Q You were upset?

"A Yes, sir, I was.

"Q And you were somewhat frightened?

"A A little.

"Q You were frightened because you saw the clothing, trousers?

"A I was frightened because of the charges they had placed on me.

"Q The charges. And because of your fright you signed this statement?

"A Yes, sir, I did.

"Q Did you read the statement before you signed it?

"A I looked over the statement. I didn't read it."

To the questions of another court member, he gave the following responses:

"Q If you had not seen your trousers in the investigators hand, would you have made this statement?

"A No, sir.

"Q And signed it?

"A No, sir, I didn't think I would.

"Q In other words, the sight of the trousers made you agree to sign the statement?

"A It made me—It put me in a shock of mind where I didn't actually realize what I—know what I was doing there."

That was his testimony on the interlocutory issue of admissibility but when he took the witness stand in his own behalf, he made the following explanation. When he gave the pretrial confession, he had a bad headache, he had been without food for twelve or thirteen hours, and he was frightened because charges were being pressed against him. Eventually, he testified that as the statement was read to him, he denied it was the truth, that he did not realize he was signing a statement, that he initialed the corrections without reading them because he had been informed he was only acknowledging a typographical error, and that he signed the statement "to get something to eat and get something for my headache."

The testimony of the accused must be considered in the light of other undisputed evidence, part of which was furnished by him. He was a member of a military police detachment and, at the time of the incident, was assigned to duty as a military policeman. He had been trained in military police techniques and knew the risk he assumed in giving an incriminating statement. He had been fully advised of his rights, knew he need not say anything, and was aware of the rule of evidence which permitted the use of a statement in courtsmartial if voluntarily given. He was not subjected to extensive examination or to any coercion, force, improper influence, or inducements, and the investigators were friendly. The oral statements were given at approximately 1:00 p.m., he had a sandwich and drink at 3:00 p.m., and he signed the written statement at 5:00 p.m. During the interim, he was not molested, and he had time to consider his oral utterances before he executed the document.

The evidence of the Government on this issue is not related by us for the reason that we are convinced as a matter of law that the seizure of the property did not induce, in whole or in part, accused's pretrial confession. While the prosecution's evidence was strong, that is unimportant, for our problem is to determine whether the accused's testimony alone required the law officer to submit to the court-martial without request the question of whether the confession was induced by the search and seizure. For the reasons set forth hereinafter, we conclude that he was not bound to submit an instruction setting out that theory.

To raise an issue on involuntariness, there must be facts produced from which it could be inferred reasonably that the use of the illegally obtained evidence caused the accused to be deprived of his right of free choice. It must in some way overcome his knowledge of his right to remain silent or it must be so closely connected with his confession that the statement is given when the accused did not possess the mental freedom to confess or deny participation in the crime. In the case at bar, neither probability is presented. Prior to the time of his confession the accused had seen his trousers in the possession of the investigating officer. That was in the company commander's office, and at that time no incriminating statements were made. He was driven from that locale to Criminal Investigation Detachment headquarters where he was interviewed. He was thoroughly briefed on his right to remain silent. The clothing was neither exhibited nor mentioned until some one and a half hours later, after he had confessed, and then only for identification purposes. He had been trained in military police work and was in the hands of friends. Since his defense was consent, the clothing would not be incriminating under the circumstances in this case, for it would only be evidence of the act of intercourse and that was admitted. There was no pressure exerted by the investigators, no subterfuges employed, and no extensive questioning.

In explaining his reasons for confessing, the accused first assigns fright, confusion, deprivation of necessities, illness, and the glimpse of his trousers, but then he goes on to say he did not read the statement, denied the portion that was read to him, and placed his initials thereon only to acknowledge the corrections. Finally, when asked why he signed an untruthful statement which admitted the commission of two serious offenses, he stated he did so to get food and medicine. In that conglomeration of excuses, it is not reasonable to find that the mere sight of his clothes in the company commander's office, at a much earlier hour, would induce the accused to admit he physically beat the victim to obtain sexual satisfaction when, according to him, she willingly consented. True it is that in answer to one leading question, he stated that after seeing the clothing he was willing to give a statement, but this was some time before he was interviewed, there were intervening events and advice, he was not suddenly confronted with the evidence, and there are no facts to support that bald statement. In the overall picture painted by him the sight of the clothing was trivial or insubstantial in light of his knowledge of the consequences of his confession. His situation is not unlike the accused in United States v Choate, 9 USCMA 680, 26 CMR 460, and there we said:

"Certain circumstances may be more vivid and compelling to one person than to another. Consequently, the effect of a particular act or statement by a law enforcement agent upon an accused under investigation depends upon many factors such as the age, intelligence, education, societal experience and background of the accused. What may not make any impression whatever upon a person wise in the ways of law enforcement may loom large in the eyes of a timid, immature, and suggestible youth. Cf. Stein v New York, 346 US 156, 183, 97 L ed 1522, 73 S Ct 1077 (1952). Whatever the circumstance, however, it must rest on fact, not imagination."

Here, the entire thrust of accused's contention was that a myriad of in-

fluences which caused him fear and discomfort impelled him to confess. The record shows that the issue of involuntariness covering those matters generally was submitted to the court under proper guidance from the law officer unless he was required *sua sponte* to isolate the alleged unlawful search and seizure and particularly call it to the attention of the court-martial. Under the facts of this case, there can be no doubt that any causal connection between the possession of the clothes and the confession is so remote that we agree with the statement of the board of review that the evidence in this case shows no more than that the accused confessed because of his fear of the consequences of his act and his sense of guilt. Consequently, this issue is decided against the accused.

## IV

The last question raises the inaccuracy of an instruction given by the law officer at the time he ▮ admitted the confession in evidence. Apparently he attempted to advise the court without the benefit of notes. Perhaps he rambled and inartfully stated the principle involved, and his charge lacked the specificity necessary to a finished instruction. However, he expressly informed the members of the court they would be instructed further on the matter at the proper time, and he did not give the court-martial a rule inconsistent with his later advice. No instruction was required at that time; the advice the law officer gave was not incorrect, but at worst only incomplete; and any deficiency in the information then given was corrected and the rule governing the issue was stated properly in his final charge. At that time, he advised the court in strict accordance with the latest decisions of this Court. Accordingly, we find no error in the law officer's instructions.

For all of the foregoing reasons, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

The accused was found guilty of rape, in violation of Uniform Code of Military Justice, Article 120, 10 USC § 920, and sodomy, in violation of Code, supra, Article 125, 10 USC § 925. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for seven years. Intermediate appellate authorities affirmed, and we granted accused's petition for review on the issues whether certain clothing was obtained from accused's wall locker as the result of an illegal search; whether the law officer erred prejudicially in limiting defense counsel's cross-examination of the prosecutrix; and whether the law officer's instructions to the court on the admissibility of the accused's confession were correct.

While I have reservations concerning the manner in which the rationale of the principal opinion is developed, I am in agreement with my brothers in their ultimate conclusion that accused was not harmed by the law officer's instructions on the admissibility of his confession or by the utilization in evidence of the items of clothing found in his locker. With respect to the first issue, it is clear the record raises no question concerning the voluntary nature of accused's pretrial statement. To the contrary, it appears that it was willingly made to a criminal investigator after proper warning and that no improper inducements were offered. Indeed, accused admits that his clothing was not displayed to him until *after* his statement was made. Accordingly, it could hardly be deemed the moving cause of his confession. With respect to the search of his wall locker, it may, as counsel urges, have been completely unauthorized. However, accused must be held to have abandoned his original objection to the testimony concerning the seized items, for he called as a defense witness one of the persons present during the examination of the locker and elicited from him testimony which identified the items seized and indicated that the accused had not sought to hide them from view. It is apparent that he thereby sought to call to the court-martial's attention the fact that he did not deliberately conceal these

articles—hoping, no doubt, to bolster his ultimate testimony of a consensual relationship by emphasizing that the clothing was a neutral factor. Under such circumstances, it is clear that an informed choice was made by counsel "to fight out at the trial level the issue of his possession." United States v Woodruff, 11 USCMA 268, 29 CMR 84; United States v Kelly, 7 USCMA 218, 22 CMR 8; United States v Smith, 2 USCMA 440, 9 CMR 70. In short, he may not now be heard to complain that the court members considered against him any inferences to be drawn from the items obtained in the search.

Left for resolution is the question posed by the law officer's ruling adversely to the defense concerning his cross-examination of the prosecutrix. My brothers believe it involved nothing more than a "diversionary dispute of no relevancy to the witness' veracity," and accordingly conclude that the law officer did not abuse his discretion. For the reasons hereinafter set forth, I am quite unable to agree with their decision.

The incident giving rise to the charges against the accused commenced with a social engagement between him and the prosecutrix. They visited the Post Cafeteria on July 29, 1958. While there, they danced together and drank some beer. During the late evening hours, they left the cafeteria and walked to a remote area on the reservation. En route, they repeatedly halted to kiss each other. Finally arriving at a skeet range shed, they continued their exchange of caresses until the prosecutrix indicated she had to return to the barracks. The accused objected, and a struggle commenced, culminating in the acts which form the basis for the findings of guilty in this case. Following the incident, accused and the prosecutrix walked back to her barracks. On the following morning, she made the occurrence known to her commanding officer, and an investigation was commenced. An inquiry conducted by criminal investigators ultimately resulted in accused's voluntary confession to both offenses charged.

At the ensuing trial, the prosecutrix testified fully concerning the circumstances surrounding the accused's behavior. On cross-examination, it was developed that there were serious discrepancies between her pretrial statement to investigators and her in-court testimony. These principally related to whether she or the accused had removed her clothing and to whether she voluntarily entered the skeet range shed or was forced to do so by the accused.

During his attack upon her relation of the events which had transpired, defense counsel's cross-examination took the following tack:

"Q Can you tell me why you walked back with a man you thought would kill you?—a man who had just raped you, and you asked him to walk back with you to your barracks. Will you tell the court why?

"A No, sir. I guess I just thought it would look kind of funny going back to the barracks that hour by myself.

"Q What do you mean 'funny'? You testified that his shirt was full of blood. You testified that you were full of blood. You testified that you were dirty. What do you mean 'funny'?

"A Well, all right. It would look strange.

"Q What do you mean by 'strange'? Weren't you afraid of him?

"A Yes, sir, I was.

"Q Then why did you walk back with him?

"A I don't know.

"Q Why did you ask him to walk back with you?

"A (The witness shook her head, indicating 'No')

"Q Do you know anybody by the name of William Boyd?

"A No, sir.

"Q Did you ever hear that name before?

"A No, sir.

"Q Who is William Boyd?

"A It's a fictitious name that somebody gave me at Fort McLellan [sic].

"Q What were the circumstances upon which this fictitious name was given to you at Fort McLellan [sic]?

"TRIAL COUNSEL: We object to

**303**

this line of inquiry, sir, and ask for an out-of-court hearing."

In the subsequent hearing before the law officer, it appeared that defense counsel was seeking to determine from the witness whether she had, some two months prior to her encounter with the accused, filed a false complaint against another soldier at Fort McClellan, Alabama, under similar circumstances. The law officer initially ruled that the inquiry could be made. However, following a recess for lunch, he reconvened the out-of-court hearing and stated that he desired to hear further argument on the issue. He indicated that a showing of any prior acts of misconduct on the part of the prosecutrix must have "resulted in a trial or conviction by any competent court." He then stated that he would permit evidence of a similar, earlier complaint by the prosecutrix against another person if "you can show that the complaint by the accused was completely unwarranted, by the witness, the earlier complaint was completely unwarranted, and I'm sure that one instance does not indicate a course of conduct, then I might be disposed to allow the questions intended to be asked of the witness."

Defense counsel then produced for the scrutiny of the law officer a copy of a Department of Defense Form 581, entitled "COMPLAINT REPORT," which set forth that the prosecutrix had complained that, during a walk together on the reservation, one William Boyd had forced her into the Fort McClellan WAC Chapel and attempted to kiss her. The prosecutrix found Boyd's attentions unwelcome, and withstood them for approximately twenty minutes, after which the parties separated. The report also indicated that no person with the name of Boyd was stationed at Fort McClellan, and that the complaint was evaluated as "UNFOUNDED." The report was signed by both the military police desk sergeant and the operations officer. After examining it, the law officer sustained the trial counsel's objection.

It should at once be made clear that defense counsel was not seeking to offer in evidence a hearsay military police report in order to impeach the prosecutrix' testimony. He tendered the document to the law officer solely to demonstrate good faith in attempting to cross-examine the complainant on the issue and to establish that he was not proceeding on a mere fishing expedition. True it is the report may be interpreted as indicating no more than that the original complaint was closed out on the failure to identify the culprit. The conclusion of the investigator that it was "UNFOUNDED," however, conflicts with that view and seems to indicate his unfavorable opinion of the prosecutrix' credibility in making the allegations. Be that as it may, it was certainly sufficient to form a basis for the interrogation of the prosecutrix and to establish that counsel was not artfully seeking to discredit the witness by means of false inferences and innuendoes. Certainly, the accused cannot be held to be restricted in his cross-examination to those inquiries concerning which he can absolutely controvert the witness' answers. If that is to be the measure of its scope, this engine for the discovery of truth has, indeed, lost most of its horsepower. I find, however, that the law is to the contrary.

In Alford v United States, 282 US 687, 51 S Ct 218, 75 L ed 624 (1931), a similar argument was made before the Supreme Court when it was shown that counsel had not been permitted to ask a witness his place of residence. Of it, Mr. Justice Stone, speaking for a unanimous Court, said:

*"Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply . . . [citing cases]. It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a*

test, without which the jury cannot fairly appraise them . . . *To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial.*" [Emphasis supplied.]

In United States v Berthiaume, 5 USCMA 669, 18 CMR 293, a majority of this Court adverted to the *Alford* doctrine with approval, and pointed out, at page 680:

"Moreover, to require positive information as a basis for such a general, nonaccusatory query would decrease markedly the leeway to which a cross-examiner is normally deemed entitled. That the questioner must be accorded latitude to probe into such matters—even those about which he lacks definite knowledge—is a principle deducible from the Manual's observation to the effect that:

'. . . Counsel often cannot know in advance what pertinent facts may be brought out on cross-examination and for that reason it is to some extent exploratory. Reasonable latitude should be given the cross-examiner, even though he is unable to state to the court what facts his cross-examination is intended to develop.' [Paragraph 149*b*(1).]"

See also United States v Hernandez, 4 USCMA 465, 16 CMR 39; United States v Long, 2 USCMA 60, 6 CMR 60; United States v Dutey, 13 CMR 884; United States v Thacker, 4 CMR 432; and United States v Peterson, 9 CMR 483.

The foregoing authorities compel in me the belief that the law officer of a general court-martial must grant counsel a wide latitude in cross-examining witnesses. This right would seem to be peculiarly broad in cases involving the placing of interrogatories to a prosecutrix in a case involving sexual offenses. These delicts generally occur under conditions of relative privacy and depend so much upon the testimony of the complaining witness that, in some cases, an accused's only defense is to be found in sifting her declarations. He is normally permitted to range over a much wider area in measuring her credibility. Thus, the Manual for Courts-Martial, United States, 1951, permits inquiry to be made into "her lewd repute, habits, ways of life, or associations, and of her specific acts of illicit sexual intercourse or other lascivious acts with the accused or others." Manual, supra, paragraph 153 *b*(2)(*b*). The result then, I believe, is that we must hold that the law officer herein erred in prohibiting any inquiry into the question of the prosecutrix' former complaint at Fort McClellan unless it can be said, as a matter of law, that the making of such is irrelevant in later prosecutions by the same female. Here, also, there is sound authority to the contrary. People v Evans, 72 Mich 367, 40 NW 473 (1888); People v Wilson, 170 Mich 669, 137 NW 92 (1912); Dawes v State, 34 Okla Cr 225, 246 Pac 482 (1926); State v Warner, 70 Utah 510, 13 P 2d 317 (1932); Rice v State, 195 Wis 181, 217 NW 697 (1928).

Commenting upon these and contrary holdings, Dean Wigmore holds it necessary to adopt an extremely liberal approach in this area:

". . . Modern psychiatrists have amply studied the behavior of errant young girls and women coming before the courts in all sorts of cases. Their psychic complexes are multifarious, distorted partly by inherent defects, partly by diseased derangements or abnormal instincts, partly by bad social environment, partly by temporary physiological or emotional conditions. One form taken by these complexes is that of contriving false charges of sexual offences by men. The unchaste (let us call it) mentality finds incidental but direct expression in the narration of imaginary sex-incidents of which the narrator is the heroine or the victim. On the surface the narration is straightforward and convincing. The real victim, however, too often in such cases is the innocent man; for the respect and sympathy naturally felt by any tribunal for a wronged female helps to give easy credit to such a plausible tale." [Wigmore, Evidence, 3d ed, § 924*a*.]

Surely, it is logical to assume that a woman who has been shown to have made a previous false complaint concerning an attack of a sexual nature has her credibility severely diminished in the eyes of the jury—and rightly so. What could be more damaging to her reputation for truthfulness than to demonstrate that she had previously made conscious use of her gender in order to attack an innocent person? One can hardly imagine a more powerful weapon in the defense arsenal where, as here, the only real issue before the court is whether she consented to accused's advances. In pointing out the importance of the defense cross-examination with respect to this point, I must assume it would have been successful, for the law officer's ruling effectively prevented us from determining the witness' answers. Regardless of what the replies may have been, I am sure it was perfectly permissible for counsel to inquire into the matter, and attempt to present the prosecutrix to the court in the light which her answers shed upon her.

Turning to my brothers' approach to the problem, I find that they believe development of the point would serve only to confuse the court members by opening up a "diversionary dispute." I am at a loss to understand that process of rationalization. Had the questions been put and the witness answered that her prior complaint was truthfully made, I fail to see how the court members could have been misled. The interrogation would have merely demonstrated that this young lady was naive and had twice made the mistake of taking more knowledgeable companions for granted. If, on the other hand, the witness had admitted the falsity of her prior complaint, the credibility of her present claim of nonconsent would properly have been rendered suspect. Certainly, the prosecution was not entitled to present her to the members of the court as entirely pure if she had previously so acted. Regardless of their nature, the answers would have been binding upon counsel, for he is not permitted to engage the court's attention completely in the trial of a collateral issue. Thus, the forbidden examination simply could not have confused anyone. I suspect that my brothers merely assume that the witness' answers would have been favorable to her cause and that no harm was done by the law officer's adverse ruling. As I am unwilling so to speculate, I cannot join in their opinion.

In sum, then, I am of the view that the accused was entitled to inquire whether the prosecutrix had previously made a false complaint of sexual misconduct against another person. I cannot assume that an inquiry into this proposition would have been useless to the defense. Accordingly, I believe the law officer's ruling was prejudicially erroneous.

I would reverse the board of review and order a rehearing.