UNITED STATES, Appellee

v

ORIDELL A. ANDERSON, Sergeant, U. S. Army, Appellant

12 USCMA 223, 30 CMR 223

No. 14,519

Decided March 17, 1961

*First Lieutenant Alonzo F. Davis* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Ralph W. Wofford.*

*First Lieutenant Carl F. Wrench* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy* and *Captain William A. Zeigler.*

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of committing an assault and intentionally inflicting grievous bodily harm. He contends he was prejudiced by certain remarks made by trial counsel in his closing argument. No objection was made at the trial, but the matter was raised before the board of review. It held that while the comments were improper, in the circumstances of the case they were not prejudicial. We granted the accused's petition for review to consider the correctness of the board of review's decision.

On Saturday, April 30, 1960, Private First Class A. W. Stackhouse consumed a substantial quantity of beer and whiskey. About midnight, he left his drinking companion in the USA PAK (United States Army Procurement Agency, Korea) area to go to his hut in another area. However, he mistakenly entered a hut in the USA PAK area. He was told he was in the wrong hut; and "one fellow hit . . . [him] in the face and told . . . [him] to leave." A sergeant helped him out, and he proceeded to his own company area. On arrival, he did not go to his hut, but entered hut 9. His purpose was to "get a couple of buddies" to go back to the USAPAK area "to talk to them about hitting . . . [him] in the face." He did not succeed in that endeavor. Instead, he got to talking to the accused. Stackhouse did not recall the nature of the discussion, but he did remember that as he started to leave the hut, the accused tried to hit him. Others in the hut "broke the fight up." Stackhouse left. While still in the company street, he saw the accused chasing Sergeant Howard. He walked toward them. As he did so, he heard some one shout, " 'Look out, he has a knife.' " The "next thing" Stackhouse knew was he was "stabbed in the stomach." He felt a sharp pain; doubled over; staggered toward the day room; stopped to lean on a fence; and then collapsed.

Stackhouse did not know who

stabbed him. However, Specialists Fourth Class R. W. Mason and H. A. Sherman testified they saw the accused hit Stackhouse in the stomach. They did not see a knife or other thing in the accused's hand at the time, but Stackhouse clutched his stomach immediately after the blow, and bent over as though his breath had been knocked out of him. Mason testified he pulled up Stackhouse's shirt and saw "a straight slit" in his stomach. A few minutes later, Stackhouse became so weak he collapsed. Sherman and another Government witness, Spease, testified that before the accused hit Stackhouse he remarked, "All I want is that PFC." According to Spease, there was no other PFC "standing around" in the street. Sherman further said that shortly before Stackhouse came into the hut, he saw the accused handling a switchblade knife. Sergeant Howard, a bystander, testified he had shouted the warning, "Look out, he has a knife," but he maintained he did not see a knife in the accused's hands, and he did not see the accused strike Stackhouse. Finally, there was testimony by a medical doctor who examined Stackhouse to the effect that the victim suffered a "life endangering" wound in the abdomen, which penetrated to the rear to strike the pancreas. The doctor said the wound could not have been caused by a blunt instrument, and was probably caused by a relatively narrow and sharp instrument, at lease three to four inches in length and about one-half inch wide. He also testified that alcohol would tend to "numb the sensation of pain to a certain extent," and that the victim was able to move around.

Testifying in his own behalf, the accused admitted that some sharp words were exchanged between Stackhouse and himself in the conversation in hut 9. He denied, however, that he had a fight; he said he was merely trying to persuade Stackhouse to go go to his own hut, and was "swinging . . . [his] finger at him" when he was pushed from behind. He fell to

the floor. He was "grabbed" by Sherman and Holmes. As he struggled to get loose, he "slapped" Sergeant Howard on the right jaw. Howard got angry. He seized his collar and said, "Sergeant, I respect you but if you do that again, I will kill you." Howard, thereupon, walked out of the hut. The accused wanted to apologize so he went out after him.[1] As he emerged, Howard shouted, "Look out, he has a knife." He turned around to see "who he was talking about." Sherman was there, and he asked the accused if he had a knife. The accused told him he did not. The accused then moved out into the company street. Howard picked up an oil can and said "If you come any closer, I will hit you in the head with this can." The accused "retreated" to the left. He yelled to Howard that "he had already messed [him] up . . . trying to straighten out the Pfc that was in the hut previously." The explanation "seemed like" it satisfied Howard because he put down the can. The accused's testimony continued as follows:

"Q. All right, now, while you were standing there after Sergeant Howard put the can down did you turn around?

"A. Yes, sir. I made a sort of left turn and looked over and it was three men standing across the ditch. One man walked from in between the other two and stepped over the ditch and as he come up to me he bent over. I thought he was going to throw up and I threw up my hands and backed away and then I turned around and told Specialist Sherman, 'Let's go back to my hut'.

"Q. How close would you say this man was that came up to you?

"A. I would say four feet.

"Q. Do you know whether, in fact, it was Pfc Stackhouse?

"A. No, sir.

"Q. You are not sure?

"A. No, sir.

"Q. At any time, did you swing at this person?

"A. No, sir, I did not swing at this person.

"Q. But he got close to you and started to lurch over, is that right.

"A. Right, sir. He bent over and I thought he was just another drunk, going to throw up and I made an attempt to dodge and in doing so I immediately turned around and proceeded back to my hut."

The accused also denied he had a knife. A search of his room, but not his person, shortly after the incident did not turn up any sharp instrument. Nor was a knife found during a search of the area about five hours later.

In his final argument, defense counsel strongly attacked the reliability of the principal prosecution witnesses because they were either drunk at the time of the incident or not really in a position to see what occurred. He also emphasized the absence of any testimony that the accused had a knife or sharp instrument of any kind in his hands. The final phase of the argument advanced a positive theory of defense. The nature and basis of the theory are in the concluding paragraphs of counsel's argument:

"Dr. George's testimony—the trial counsel tries to give the interpretation that it is most favorable to him but I feel it is certainly as favorable to the accused. In answer to a question from the court, I think it was Captain Gile—would alcohol or intoxication tend to deaden the pain, the wound, he stated yes. He stated that Private Stackhouse was in an intoxicated condition when admitted down at the 121 Hospital and that he was able to maneuver on his own. And, isn't it fair to assume from this, and despite counsel's objection, that Private Stackhouse was stabbed when he was over at Wire Company? He got in a fight, he tried to get in some other man's bed, he got into a heated argument, he admits a blow was swung at him.

"Specialist Mason's testimony is that, when he came into hut 9, his

---

[1] Mason testified that the accused was restrained by Howard, Sherman, and Holmes because he "was trying to get loose and go out of the hut after Pfc Stackhouse."

shirt tail was out, he was hollering, he was in an intoxicated condition and he stated something about, 'I am cut' 'I am cutting out'.

. . . . .

"The key witnesses were drunk with the exception of Specialist Mason and he was at least one hundred feet away from where the alleged incident occurred. We don't know where it occurred, since there is a contradiction in the testimony and most important of all, the victim himself will not state it was the accused.

. . . . .

"There is a clear indication—not a clear indication—but there is a good possibility that this wound was administered earlier in the evening and it seems to me that the trial counsel could have eliminated any doubt on this by contacting the people from Wire Company and getting their testimony and straightening out that matter but did he? I am sure he will have an explanation for that but the fact remains that these people did not appear before the court and I am sure there are at least one or two in that Wire Company who could give us some light on this testimony.

. . . . .

"It is possible and, I think that is most important, that this wound was administered at another time, even if it wasn't at the Wire Company. There is no indication that Sergeant Anderson was the one who specifically stabbed the victim and I feel you should keep that in mind because you have a man's whole future at stake. You make a decision and that is it. Do not convict on the wound alone. Please convict on the evidence that came before you yesterday and it seems to me that evidence is most flimsy and is not sufficient to support this charge."

Trial counsel opened his own final argument by referring to the above-mentioned part of defense counsel's argument. His remarks provide the predicate for the accused's present claim of prejudice. They are as follows:

"At this late stage in the trial the issue of whether the victim possibly was stabbed at another place prior to the incident about which we have heard so much has been raised.

"As the defense counsel well knows, I have two witnesses from USAPAK, not from Wire Company, as we heard Private Stackhouse say he had been at USAPAK that evening, not at Wire Company. I have two witnesses whom I am prepared to call who will testify as to Private Stackhouse's presence at USAPAK that evening prior to his going to 57th Signal Support Company and he will testify as to where he was hit there and that he was not wounded at that time.

"If defense counsel would like me to call them, I will be happy to do so.

"DC: The prosecution has rested, hasn't it?

"LO: Go ahead with your argument and forget about calling witnesses."

Appellate defense counsel contend that trial counsel's remarks constitute unsworn testimony on a vital issue in the case, and were, therefore, prejudicial to the accused. See United States v Britt, 10 USCMA 557, 28 CMR 123; Ginsberg v United States, 257 F2d 950 (CA 5th Cir) (1958); Stewart v United States, 247 F2d 42 (CA DC Cir) (1957). On the other hand, Government counsel maintain that trial counsel's comments were specifically invited by defense counsel and constitute a proper and relevant refutation of alleged deficiencies of his presentation of the Government's case which were advanced by defense counsel. See United States v Doctor, 7 USCMA 126, 21 CMR 252.

The Government's argument has support in defense counsel's language and the interpretation accorded it by both trial counsel and the law officer. Thus, defense counsel said he was "sure" trial counsel would have "an explanation" for the absence of witnesses to the ejection of Stackhouse from the hut in the USAPAK area. He even attempted to anticipate the explanation. Manifestly, trial counsel interpreted the argument as a per-

sonal attack on the thoroughness of his preparation of the Government's case. Consequently, he accepted the "invitation" to "explain" by pointing out that he had not overlooked the earlier incident, and that the defense knew he had witnesses who could prove Stackhouse was in the USAPAK area earlier in the evening. The law officer's direction to trial counsel to "go ahead with . . . [his] argument and forget about calling witnesses" indicates rather clearly that he did not consider trial counsel's remarks as constituting more than a reply to defense counsel's charge of neglect. Further evidence of the law officer's view of the nature of the exchange between counsel appears in his instruction to the court members that "counsel by their arguments may not present evidence. It is their mission to give their interpretation of the evidence already admitted." The legally trained persons at the trial certainly saw nothing more than "argument" in the comments of both counsel, and it seems hardly likely that the court members regarded it in a different light. See United States v Johnson, 3 USCMA 447, 454, 13 CMR 3; United States v Goodman, 110 F2d 390, 394, 395 (CA 7th Cir) (1940). Understood as advocacy, trial counsel's comments could not be prejudicial to the accused. As the Court of Appeals for the District of Columbia in the *Stewart* case, supra, page 45, said:

". . . a prosecutor's words are not prejudicial error if the jury would understand from the context that they represent merely advocacy rather than *testimony*."

However, we need not rest our decision merely upon whether trial counsel's comments constitute advocacy rather than testimony. Reversal of a conviction on the ground of improper argument by trial counsel is not justified if the evidence of guilt is clear and compelling. United States v Beatty, 10 USCMA 311, 314, 27 CMR 385, opinion by Chief Judge Quinn. The evidence here points so overwhelmingly toward the conclusion that the victim was stabbed after, not

before, his conversation with the accused in hut 9, that the court members could hardly have been influenced in their verdict by what trial counsel said about the availability of other witnesses.

The defense theory that the stabbing could have occurred in the earlier incident depended to a large extent upon the contention that when Stackhouse entered hut 9, his shirt tail was out and he was "hollering . . . 'I am cut' 'I am cutting out.'" The latter part of the statement is a distortion of Mason's testimony. Mason said that when Stackhouse came into hut 9 he was "staggering slightly" because he was drunk, but he stood straight and "in no way" did he "appear to be hurt at all." While Stackhouse's "shirt tail was hanging out" it did not appear as though he had been in a fight. Moreover, the "cutting" statement was not made by Stackhouse when he entered hut 9; it was made *after Stackhouse had talked to the accused for several minutes*. Mason's testimony on that point is as follows:

"WITNESS: When he said, 'I am cutting out' was not when he left the barracks, this was after he had come out of Sergeant Anderson's corner and spoke to Specialist Sherman and Sergeant Anderson called him back in there. At that time he said, 'No, I am cutting out' and then Sergeant Anderson came out. When he actually left the barracks he said nothing because I told him for the second time to get out and go to bed, go back to his hut and go to bed and keep out of trouble and he said, 'Okay' and left."

Defense counsel also relied upon the medical testimony that intoxication would tend to dull "to some extent" the pain suffered by Stackhouse after the stabbing wound. That circumstance hardly sustains the inference that a person whose abdomen had been completely penetrated by a sharp instrument would suffer no noticeable pain. Apart from the matter of pain, there is the very striking contrast between Stackhouse's conduct after the incident in the hut in the USAPAK

area and his conduct after he approached the accused in the company street. The contrast so strongly supports Stackhouse's testimony that he was merely struck in the face in the USAPAK incident as to leave no room to infer that he was also stabbed at that time but did not know it. Thus, he traversed the distance from the area to his own company, he engaged in conversation with several persons, and did not appear to them to be suffering from any injury; he "backed off" from a threatened blow by the accused in hut 9, and left without any indication he was hurt and with the assertion that he was "okay." On the other hand, when he was struck by the accused, as several prosecution witnesses testified, he doubled over; groaned; gasped for breath; and walked only a short distance before he became so "weak in the knees" that he collapsed and had to be taken to the hospital.

The evidence in this record of trial "fairly shrieks the guilt" of the accused. Lutwak v United States, 344 US 604, 619, 97 L ed 593, 73 S Ct 481. Consequently, even if improper, trial counsel's remarks present no fair risk that they influenced the court-martial in its deliberation as to the accused's guilt or innocence.

The decision of the board of review is affirmed.

LATIMER, Judge (concurring):

I concur.

I concur with the Chief Judge, but I prefer to supplement his discussion by stressing one aspect of this controversy which he does not develop. The most significant part of defense counsel's argument is found in these statements:

". . . it seems to me that the trial counsel could have eliminated any doubt on this by contacting the people from Wire Company and getting their testimony and straightening out that matter but did he? I am sure he will have an explanation for that but the fact remains that these people did not appear before the court and I am sure there are at least one or two in that Wire Company who could give us some light on this testimony."

This seems to me to be an argument which imputes bad faith to trial counsel in the sense that he is charged with suppressing available testimony which would aid in ascertaining the truth. When that situation confronts them, reasonable men are prone to believe that the testimony would be unfavorable to the Government. Undoubtedly that was the impression defense counsel was seeking to convey to the court members. Viewed in that context, the reply by trial counsel was not only invited but an explanation was in order. The phraseology used was not inflammatory and indicated no more than a willingness to produce the witnesses, a statement as to their expected testimony, and an assertion that defense counsel knew of their availability to the prosecution. Accordingly, if trial counsel went outside of the record, he tread only on grounds opened up to him by defense counsel. It would indeed be bad law to require counsel representing either party to leave unanswered imputations of improper and unfair tactics. Significantly, trial counsel was not indulging in rhetorical conjectures for he offered to produce the witnesses and place the evidence before the court if the defense would assent. For obvious reasons, defense counsel raised an obstacle to that procedure by asserting that the prosecution had rested. The record indicates he displayed wisdom in that regard for the evidence compels a conclusion that the injury was not inflicted in the first altercation. It would be fantastic to suppose a witness could be produced who would testify to the contrary.

FERGUSON, Judge (concurring in the result):

I concur in the result.

There is not the slightest basis in this record for an inference that the accused's victim suffered the stab wound inflicted upon him during an earlier altercation in another barracks. The sole evidence with relation to that

point is found in the victim's testimony that he had, approximately one hour before he was stabbed, attempted to go to sleep in another man's bed in the other barracks, *was struck in the face by the other person,* and summarily ejected from the building. Moreover, all of the testimony relating to the time the wound was suffered indicates that it occurred during the melee in which the accused was involved. The only real issue before the members of the court was whether it was the accused or one of the other soldiers then present who assaulted the victim. Accordingly, the statement by the trial counsel that, as defense counsel knew, he could prove the wound was not suffered earlier could not have affected the court-martial in its deliberations. Finally, the law officer expressly advised the members of the court-martial that the question of the accused's guilt or innocence must be resolved on the basis of the "evidence admitted in court" and that "counsel by their arguments may not present evidence." Under the circumstances, there is simply no fair risk that the trial counsel's improper reference was prejudicial to the substantial rights of the accused. Stewart v United States, 247 F2d 42 (CA DC Cir) (1957); United States v Beatty, 10 USCMA 311, 317, 27 CMR 385.