UNITED STATES, Appellee

v

JOSEPH WILLIAMS, Private First Class,
U. S. Army, Appellant

17 USCMA 358, 38 CMR 156

*Captain Stephen Arinson* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Lieutenant Colonel Martin S. Drucker,* and *Captain John Kagel.*

*Captain David K. Fromme* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick* and *Major John F. Webb, Jr.*

## Opinion of the Court

QUINN, Chief Judge:

Appellant stands convicted of cowardice before the enemy in Vietnam and disobedience of the order of a superior noncommissioned officer "to move forward and join" his squad, in violation of Articles 99 and 91, Uniform Code of Military Justice, 10 USC §§ 899 and 891, respectively. His sentence extends to a dishonorable discharge and confinement at hard labor for three years. On this appeal, he contends the evidence is insufficient to support the findings of guilty of cowardice, and that he was prejudiced by certain remarks of trial counsel and the law officer.

As to the first issue, the specific question is whether the accused misbehaved himself as the result of cowardice. On the date alleged, his squad was engaged in a heliborne operation against the Vietcong forces. The helicopter missed the designated landing zone, and came down in a rice paddy. As the squad members left the helicopter, they were subjected to "moderate" to "heavy" machine gun and small arms fire from Vietcong forces in a village to the left of the rice paddy. The squad was divided into two teams, Team A and Team B. Team A consisted of four men; Team B had five men, including the accused. Following standard procedure, Team A moved forward to set up a base of fire, while Team B maneuvered forward. In turn, Team B provided a base of fire, and Team A maneuvered. The squad reached a large dike, which was the "prior designated position." From that position, it acted as a security force to protect the landing of other elements of the operation. Sergeant Wolfe, the Team B leader, reported to Platoon Sergeant Billy L. Bowlin, the squad leader, that the accused had not moved forward with his Team. The accused remained "out in the middle of the rice paddy where he got off the chopper," about seventy to one hundred meters to the rear. He was behind a small dike.

Intermittently, during the next thirty-five to forty minutes, Sergeant Bowlin "hollered" to the accused to move up; and at least once he told accused he was giving him a "lawful order" to "get . . . over here." The accused made different responses to Bowlin's calls. During the "first 15 or 20 minutes" he maintained he was "hit" and "could not stand up." Then, he said he "had a pungi stick in his leg." On a number of occasions, he replied "that his weapon was jammed." Finally, Sergeant Carlos Torres "checked . . . out" the accused, and the accused said: " 'I'm moving, I'm moving.' "[1] In a "low crawl," the accused crossed the rice paddy and came up to Sergeant Bowlin. He told the Sergeant his weapon, an M-16, was jammed. The weapon appeared to be "still intact." According to Sergeant Bowlin, once an M-16 jams, it "will never fire again" because "the bolt will bust." Bowlin told the accused to test fire the rifle into a pond. The accused

---

[1] Before trial, Sergeant Torres was wounded and had been returned to the United States.

"fired his weapon one time and *then* it jammed." (Emphasis supplied.) Thereupon, Sergeant Torres gave the accused a rifle that had belonged to a man who was wounded.

About ten to fifteen minutes after the accused rejoined the squad, it moved down the dike, as the last element in the advance toward the village. Although, because of the "turmoil," Sergeant Bowlin did not specifically examine Williams for injury, to the "best" of his knowledge, Williams "had not been shot; had no pungi stick" wound "or nothing." He put Williams "up in front" of him "to prod . . . [him] along" as they moved into the village. After the village had been secured, Specialist Four Charles L. Lostanau, another member of the squad, met the accused. He had earlier heard the accused call to Sergeant Bowlin from the rice paddy that he had been hit and could not stand up, but he observed that the accused "wasn't limping or anything."

Two items of evidence form the linchpins of the defense argument as to the insufficiency of the evidence. The first is that the accused's state of mind during the period in issue is best indicated by his own statements that he was "hit" and "could not stand up"; that he had a pungi stick in his leg; and that his weapon was "jammed." All these statements, say appellate defense counsel, demonstrate the accused did not act through fear, but because of "injury or inoperative equipment." The second is that the accused joined the squad "of his own volition," and this evidence "weighs heavily against any inference of fear."

All the evidence is opposed to the defense contention that the accused moved forward of his ▆▆▆▆▆▆▆ ▆ "own volition" to join the squad. For more than half an hour he repeatedly told Sergeant Bowlin he was " 'moving,' " but he did not move. It is apparent that he did not move until Sergeant Torres "checked him out." Bowlin was not allowed to testify as to what Sergeant Torres told him about the results of his examination of the accused, but from the evidence the court members could reasonably infer, as we shall point out below, that the accused was neither shot nor wounded by a pungi stick. Consequently, after Sergeant Torres' examination the accused was in an untenable position and could no longer remain in the rice paddy. His movement forward, therefore, was not an act of his own choosing.

There is an abundance of evidence to justify the conclusion by the court members that the accused's successive and different replies to Sergeant Bowlin were false. While Bowlin admitted he did not personally examine the accused for signs of a wound, the circumstantial evidence establishes that he saw no evidence of any injury. The accused was in Bowlin's immediate presence. Bowlin observed him test fire his rifle, and he also had him under his direct observation during the move into the village. His testimony clearly implies he closely watched all accused's movements. In addition, Bowlin testified he knew that the first squad, which included the accused, "took no casualties"; and that the first casualty in the entire platoon occurred "the following day—that's when Kantz was hit." The court members, therefore, had a substantial factual basis upon which to credit Bowlin's testimony that, to the "best" of his knowledge, the accused "had not been shot; had no pungi stick" wound "or nothing" wrong with him while he was in the rice paddy.

Sergeant Bowlin's testimony is corroborated by that of another member of the squad. It will be recalled that Specialist Lostanau encountered the accused in the village. He had heard the accused call from the rice paddy that he had been hit and could not stand, but he testified that when he met the accused, he "wasn't limping or anything."

Besides disputing the accused's representations of injury, Sergeant Bowlin's testimony also conflicts with the accused's statement that his weapon was jammed. Bowlin testified he knew that a jammed M–16 will not fire again without exploding the bolt; consequently, when the accused finally came up to the dike he had him fire his weapon into a pond. The rifle fired

once then jammed on the *second* shot. Bowlin's testimony also indicates that, during the time the accused remained in the rice paddy, other elements of the company debarked from helicopters and deployed along the dike, so that eventually "friendly troops" extended "all the way down" the dike. It is reasonably inferable that the accused witnessed the movement of these elements before he moved forward.

It is arguable that some of the evidence in the record of trial can be viewed as indicating that the accused was not motivated by cowardice in remaining in the rice paddy. For example, his position in the rice paddy was at least as exposed to enemy fire as the position of the other members of the platoon at the dike. Even this evidence, however, is not wholly opposed to the prosecution's case. As Government counsel point out, it is not unreasonable to infer that the accused believed himself safer "away from the main body" which was "drawing fire" from the enemy.

Much of the evidence against the accused is circumstantial, but circumstantial evidence can as effectively prove the existence of a fact as direct evidence. United States v Mason, 8 USCMA 329, 24 CMR 139. Considering all the evidence, and the permissible inferences therefrom, the court members could, in our opinion, conclude beyond a reasonable doubt that by remaining in the rice paddy, instead of moving forward against the enemy with the others in his squad, the accused was motivated by fear. United States v Smith, 2 USCMA 197, 7 CMR 73.

The accused's second assignment of error attacks certain remarks by trial counsel and the law officer in connection with counsel's arguments on the merits. Trial counsel's initial argument consisted of a brief review of the testimony of the witnesses "we" brought before the court-martial. Referring to the testimony of Sergeant Adrien Oscar Belanger, he reminded the court members that Belanger had testified that Bowlin had called to the accused several times without eliciting a response. He continued his argument as follows: " 'Then he [the accused] did answer, and he said that he had thought he had been hit or hurt, and he could not stand up. Which later we found out was false.' " At the end of the review of the evidence, trial counsel described the Government's case as "simple," and said "we believe that we have proven to you the alleged offenses."

At the conclusion of trial counsel's argument, defense counsel requested and was granted a side-bar conference. The transcript of the conference is as follows:

"DC: Sir, when he was summarizing the testimony of Sergeant Balenger, he said that—the statement that you had in here, which was later found out to be false—we agreed to omit that because he had no personal knowledge as he testified. And you put that in there in your closing argument. I didn't object when he read it because I hadn't checked the deposition.

"TC: I definitely did. I forgot.

"DC: That was not read in the deposition in court.

"TC: It was my own opinion. I will admit that I did forget to omit it, because I agreed to take that out.

"LO: What relief do you want then? I could tell them that their recollection of the evidence controls.

"DC: That's fine, sir."

In his own argument, defense counsel disagreed with trial counsel's comment that the case was a "simple" one. He maintained that if the case had been a simple one, he would not "be here before you today." At this point, he was interrupted by the law officer as follows:

"LO: Excuse me. Captain Barnhart, we get lots of simple cases in general court[s], and I don't think it's proper for you to argue that this is—of the mere fact that you're here that it shows that it's a complicated case."

Defense counsel replied "Yes, sir," and proceeded to review the evidence as

construed by the defense. When he finished, trial counsel made a brief final argument, in which he again remarked that the Government's case was "simple." "[W]e submit," he said "he [the accused] lied three times and failed to come forward."

At the appropriate stage of the proceedings, the law officer instructed the court members on the elements of the offenses and the pertinent rules of law. In part, he instructed as follows:

"The prosecution asks you to draw one set of inferences while the defense asks you to draw another. It is for you to decide, and for you alone, which inference you will draw.

. . . . .

"You must rely solely on your own recollection of the evidence and not counsel's versions. You must disregard the personal opinion of counsel as to the guilt or innocence of the accused, or their opinion if they have vouched any, as to the sufficiency or insufficiency of the evidence."

As the excerpts indicate, Belanger's deposition was reviewed by counsel and the law officer, and certain portions were ruled inadmissible. These were not read to the court members when the deposition was admitted in evidence. One of the deleted parts was the phrase, "Which was later found out to be false." The pertinent text, which provides its context, is as follows:

". . . He called for Williams several times before Williams answered. When he did answer he said that he thought he had been hit or hurt and he could not stand up. [Which was later found out to be false.] He called several times after that, but still Williams did not move."

Since the disputed phrase was not admitted in evidence, trial counsel certainly could not argue that Belanger had so testified. United States v Long, 17 USCMA 323, 38 CMR 121. Trial counsel's argument, however, is slightly but significantly different from the deposition testimony. His statement was: "'Which later *we* found

out was false.'" (Emphasis supplied.) Although trial counsel admitted he had forgotten about the deletion, he contended his argument represented his "own opinion." The form of his argument supports the contention. Throughout, trial counsel used the word "we" to indicate the Government's position. The addition of that word to the phrase identified it as part of the Government's theory, rather than as part of Belanger's testimony. It is apparent from the instruction proposed by the law officer and accepted by defense counsel that this was their interpretation of trial counsel's remark. We are not persuaded that the court members construed the matter differently from the law officer and defense counsel. United States v Anderson, 12 USCMA 223, 227, 30 CMR 223. See also United States v Tackett, 16 USCMA 226, 232–233, 36 CMR 382. However, assuming the court members regarded trial counsel's remark as a comment on a matter not in evidence, we perceive no prejudice to the accused.

Belanger's own testimony leaves no doubt as to the falsity of the accused's representation that he was hit and could not stand. Belanger admitted he did not "personally check . . . out" the accused "to see if he had been hit or not," but he testified he saw the accused when he finally moved up from the rice paddy to the dike. He observed him move in a "low crawl" for approximately forty meters. He again saw the accused when the squad moved from the dike to the village. The accused's movements on these occasions were patently contrary to his earlier assertion that he could not move. Belanger's testimony is corroborated by Bowlin's testimony, especially that to the effect the squad suffered no casualties on the day of the incident, and Lostanau's testimony that the accused "wasn't limping or anything." The quantity and uncontradicted nature of the evidence convince us that the "court members could hardly have been influenced in their verdict by what trial counsel said about" Belanger's testimony. United States v Anderson, supra, at page 227.

We turn now to the part of the assignment of error which deals with the law officer's interruption of defense counsel's argument. In substance, the accused contends the law officer's comment could reasonably be construed by the court members as indicating a belief on the part of the law officer that trial counsel's evaluation of the evidence was correct. Appellate defense counsel maintain that the comment "completely tilted" the scales by which the court members were to weigh the evidence "in favor of the prosecution." The argument suffers from many faults. First, the law officer's remark is a truism. By law, every accused is entitled to counsel at a general court-martial, and the mere appearance of counsel at trial is no indication that the case "is complicated." Secondly, if the remark is regarded as an opinion on whether the case was "simple" or "complicated," it did not in any way reflect on the strength of the Government's evidence or the weakness of the accused's evidence. In any event, as an opinion on the evidence, it did not, in our view, survive the law officer's emphatic direction to the court members to disregard any comment or statement made by him "which may seem to indicate an opinion as to the guilt or innocence of the accused." United States v Smith, 3 USCMA 25, 11 CMR 25; United States v Berry, 6 USCMA 638, 20 CMR 354. From any standpoint, therefore, this aspect of the assignment of error also lacks merit.

The decision of the board of review is affirmed.

Judges FERGUSON and KILDAY concur.